# EXHIBIT 1

Mark O. Morris (4636)
Bret R. Evans (15131)
**SNELL & WILMER L.L.P.**
15 W. South Temple, Suite 1200
Salt Lake City, Utah 84101
Telephone: (801) 257-1900
Facsimile:  (801) 257-1800
E-mail: mmorris@swlaw.com
            brevans@swlaw.com

*Attorneys for Plaintiff Mitchell International, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **MITCHELL INTERNATIONAL, INC.**, a Delaware corporation,<br><br>         Plaintiff,<br><br>vs.<br><br>**HEALTHLIFT PHARMACY SERVICES, LLC**, a Utah limited liability company; **BRIAN ANDERSON**, an individual, **NATALIE NEIL**, an individual; and **JOSEPH NOLL**, an individual,<br><br>         Defendants. | **COMPLAINT**<br><br><br>Civil No. 2:19-cv-000637-RJS<br><br><br>Honorable Robert J. Shelby |

Plaintiff Mitchell International, Inc. ("**Mitchell**") complains of Defendants HealthLift

Pharmacy Services, LLC, Brian Anderson, Natalie Neil, and Joseph Noll (collectively,

"**Defendants**") and seeks relief as follows:

### NATURE OF THE ACTION

1.        This is an action to recover damages arising from and caused by Defendants'

unlawful acts, including breaches of contract, misappropriation of trade secrets, tortious

\4820-7240-8223

interference with Mitchell's contracts and economic relations, and civil conspiracy to use Mitchell's confidential and proprietary trade secret information that they either sold to or acquired while working at Mitchell in competition against it.  They used this in creating a new entity and then soliciting away one of Mitchell's largest customers, Walgreen Co. ("**Walgreens**"), thus causing Mitchell to lose one of its valuable customers and to suffer ongoing damages.

### THE PARTIES, JURISDICTION, AND VENUE

2.      Mitchell is a corporation incorporated in the State of Delaware with its principal place of business in San Diego, California.

3.      Under 28 U.S.C. § 1332(c)(1), Mitchell is a citizen of both Delaware and California.

4.      HealthLift Pharmacy Services, LLC ("**HealthLift**") is a limited liability company organized in the State of Utah with its principal place of business in Salt Lake City, Utah.

5.      Upon information and belief, none of HealthLift's members are domiciled in California or Delaware.

6.      Under 28 U.S.C. § 1332, HealthLift is not a citizen of either Delaware or California.

7.      Brian Anderson ("**Anderson**") is an individual who, upon information and belief, is domiciled in Salt Lake City, Utah.

8.      Under 28 U.S.C. § 1332, Anderson is a citizen of Utah.

9.      Upon information and belief, Anderson is a member of HealthLift.

10.     Natalie Neil ("**Neil**") is an individual who, upon information and belief, is domiciled in Alpine, Utah.

11.     Under 28 U.S.C. § 1332, Neil is a citizen of Utah.

12.     Joseph Noll ("**Noll**") is an individual who, upon information and belief, is domiciled in Bartlett, Illinois.

13.     Under 28 U.S.C. § 1332, Noll is a citizen of Illinois.

14.     This Court has subject matter jurisdiction over this action because it involves citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     Personal jurisdiction is proper because HealthLift is registered in and has its principal place of business in Utah, Anderson and Neil are domiciled in Utah, and many of the unlawful acts giving rise to the causes of action at issue occurred in Utah.

16.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the causes of action at issue occurred in this district.

## FACTUAL BACKGROUND

**Mitchell's Background and Business Model**

17.     Mitchell is an industry leading provider of software and technology solutions for the property and casualty claims and collision repair industries, delivering smart solutions that simplify and accelerate claims handling, pharmacy transactions, and auto repair processes for insurance carriers, third-party administrators, self-insured entities, pharmacies, and auto repair facilities.

18.    Mitchell's Pharmacy Solutions division is comprised of two main business lines: pharmacy benefit management ("**PBM**") and revenue cycle management ("**RCM**"), both of which help injured workers' compensation and auto accident claimants access and receive timely prescription benefits.

19.    In its PBM business line, Mitchell provides workflow and connectivity solutions to manage claimants' prescription drug benefits arising out of a work-place injury or auto collision on behalf of the compensable insurance company.  Mitchell contracts directly with the insurance company to manage prescription benefits for claimants, including providing claimants with access to a nationwide network of pharmacies, and providing pharmacy information card processing, clinical services, and an integrated technology and workflow connecting the pharmacy to the compensable insurance company.  In its PBM business line, Mitchell's customers are insurance carriers, third-party administrators, and self-insured entities.

20.    Mitchell's RCM business line provides financial intermediary services to pharmacies for the billing of medication prescriptions in workers' compensation and auto collision claims by purchasing prescription receivables from pharmacies and then billing the responsible insurance company.  In providing these services, Mitchell provides payment upfront to the pharmacies dispensing the medication, allowing for the timely dispensing of medication to claimants.

21.    Mitchell's RCM solution is unique to the property and casualty industry.  This is because a patient would typically provide the pharmacy with their billing information, but in the case of an auto collision or work place accident, immediate treatment or medication may be required for which a claimant does not have a prescription coverage card.  Instead of the

claimant paying out-of-pocket for the prescription and then submitting the receipt for

reimbursement to the insurance company, Mitchell's RCM business pays the pharmacy upfront

without having full knowledge of whether an insurance company will accept full financial

responsibility of the prescription benefits utilized.  In its RCM business, Mitchell's customers are

national chain pharmacies, food and drug retailors, and individual independent pharmacies.

22.     Over many years and through substantial time, cost, and effort, Mitchell has

developed confidential and proprietary trade secret information related to the PBM and RCM

services it provides.  This information includes but is not limited to its strategic plans for

developing and marketing its products and services; its database of customers and clients,

including their transaction history, metrics, contracts, and pricing arrangements; underwriting

processes, including the specific electronic rules by which Mitchell chooses to accept or reject a

pharmacy prescription submission to Mitchell; proprietary processes and procedures related to

the verification of claim coverage and the specific processes to collect on compensable claims

for specific insurance carriers; pricing details, corresponding workflow, and network agreements

with Mitchell's own pharmacy benefit management solution as well as with outside pharmacy

benefit management solutions; and software and computer programs.

23.     Mitchell takes active steps and uses reasonable means to safeguard its confidential

and proprietary trade secret information.  All employees are required to sign agreements that

include obligations not to disclose any such information or make use of it for their own purposes

or the purposes of another during or after their employment with Mitchell.  Mitchell's

confidential and proprietary trade secret information is accessible only within the company by

those having a legitimate business reason for accessing or using it.

24.     Because of the time, effort, and resources that Mitchell has devoted to the creation and maintenance of its confidential and proprietary trade secret information, such information has independent economic value and its disclosure will cause (and has caused) Mitchell to lose a valuable competitive advantage over other companies in the industry.

25.     In consideration for their employment with Mitchell, certain employees also execute employment agreements whereby they covenant not to participate in businesses that compete with Mitchell, not to solicit or hire away Mitchell employees under specified conditions following their employment with Mitchell, and not to disclose Mitchell's confidential and proprietary trade secret information.

**Mitchell's Acquisition of Cogent and Cogent's Subsidiaries**

26.     Cogent Works, LC ("**Cogent**") was a Utah limited liability company that provided certain PBM and RCM services.

27.     Cogent was the majority owner of three subsidiaries: Auto Rx, LC; Comp Today, LC; and Cogent Care, LLC (together, "**Cogent's Subsidiaries**").

28.     In an effort to enter into and develop its PBM and RCM services in the pharmaceutical industry, on or about November 25, 2014, Mitchell entered into an asset purchase agreement (the "**APA**") with Cogent and Cogent's Subsidiaries to purchase substantially all of their tangible and intangible assets.

29.     Annapurna, Inc. ("**Annapurna**"), Cogent's sole member, and Anderson, Annapurna's sole shareholder, were also parties to the APA.

30.     At the time of the APA, Cogent and Walgreens were parties to that certain *Claim Processing and Direct Payment Agreement* dated July 1, 2014, and Auto Rx, LC and Walgreens

were parties to that certain *Letter Agreement for Retail Personal Injury Protective Prescription Services* dated December 1, 2013. Both of these agreements are for RCM services.

31.    The total consideration Mitchell paid under the APA to Anderson and the companies he owned and controlled included $52.7 million paid at the closing of the asset transaction on January 30, 2015 (the "**Closing**"), plus a potential earnout of up to $24 million based on the achievement of certain earnings targets to be measured through January 31, 2017, for a total purchase price of approximately $77 million. Nearly half of the $77 million total purchase price was allocated for the purchase of Cogent's and Cogent's Subsidiaries' customer relationships, including their relationship with Walgreens. Further, the $24 million earnout was targeted almost entirely on earnings achievements of Cogent's newly-acquired business with Walgreens for RCM services.

32.    Under the APA, Cogent warranted it was "the sole and exclusive owner of all [of its] Company Intellectual Property Rights (except the Company Licensed Intellectual Property)," as those capitalized terms were defined in the APA, and sold those Company Intellectual Property Rights to Mitchell.

33.    The APA defined Company Intellectual Property Rights as intellectual property rights "that are used (or held for use) in or for the Business . . . owned by, or licensed exclusively to (or claimed by [Cogent] or any of [Cogent's Subsidiaries] to be owned by or exclusively licensed to), [Cogent] or [Cogent's Subsidiaries]."

34.    As a material inducement to Mitchell to enter into the APA, Anderson and Annapurna represented and warranted that they did not have "any right, title or interest (whether as owner, licensee or otherwise) in, to or under (a) any Company Intellectual Property Rights or

(b) any other tangible or intangible property related to [Cogent's] or [Cogent's Subsidiaries']
business."

35.     As another material inducement, Anderson and Annapurna also represented and
warranted that they were not "currently involved with any other business activities reasonably
related to the business of [Cogent] or [Cogent's Subsidiaries]."

36.     In the APA, Anderson and Annapurna agreed that after the closing of the APA,
they would not "retain or use any of Company Intellectual Property Rights."

37.     The APA also included restrictive covenants, which, among other obligations,
required that Anderson neither "cause, induce, solicit or encourage any employee, contractor,
vendor, service provider, strategic partner or prospective customer of [Mitchell] (the "Covered
Persons") to terminate such status," nor "intentionally disrupt or interfere with, or attempt to
disrupt or interfere with, the relations of [Mitchell] or any of its Affiliates with any Covered
Person concerning the business."

38.     The restrictive covenants in the APA expired "on the third anniversary of the
Closing [of the asset purchase transaction]."

39.     The Closing was on January 30, 2015, and the restrictive covenants in the APA
expired on January 30, 2018.

40.     Following the Closing, Anderson, Neil, and Noll became employees of Mitchell
on or about January 30, 2015.

41.     While Cogent and Auto Rx, LC had entered into the *Claim Processing and Direct
Payment Agreement* and *Letter Agreement for Retail Personal Injury Protective Prescription*

*Services* with Walgreens prior to the Closing, the RCM services provided to Walgreens under these agreements were developed at Mitchell after the Closing.

42.  Within the approximate next three years—during which time the restrictive covenants were in full force and effect—Anderson, Neil, and Noll orchestrated and executed a scheme to open a competing PBM and RCM business, essentially reopening Cogent, but with Mitchell's confidential and proprietary trade secret information.

43.  Anderson's, Neil's, and Noll's plan culminated with the creation of HealthLift in June 2018.  Since that time, Defendants have utilized Mitchell's confidential and proprietary trade secret information to induce Walgreens, one of Mitchell's largest customers, to cease its business relationship with Mitchell, resulting in immediate and continuing damages to Mitchell.

**Defendant Brian Anderson**

44.  When Mitchell entered into the APA, Anderson was employed as Cogent's President.

45.  Upon the Closing, Anderson became employed with Mitchell, serving as Vice President and General Manager of Mitchell's Pharmacy Solutions division (PBM and RCM).

46.  As Vice President and General Manager of Mitchell's Pharmacy Solutions division, Anderson had access to and did access Mitchell's confidential and proprietary trade secret information related to the PBM and RCM services it provides.  This information includes but is not limited to its strategic plans for developing and marketing its products and services; its database of customers and clients, including their transaction history, metrics, contracts, and pricing arrangements; underwriting processes, including the specific electronic rules by which Mitchell chooses to accept or reject a pharmacy prescription submission to Mitchell; proprietary

9

processes and procedures related to the verification of claim coverage and the specific processes to collect on compensable claims for specific insurance carriers; pricing details, corresponding workflow, and network agreements with Mitchell's own pharmacy benefit management solution as well as with outside pharmacy benefit management solutions; and software and computer programs.

47.     In his role as Vice President and General Manager of Mitchell's Pharmacy Solutions division, Anderson had access to and did access competitively sensitive and intimate details of Mitchell's business, including details related to its ongoing business engagement with Walgreens.

48.     As part of his employment with Mitchell, Anderson executed an *Executive Employment Agreement* with Mitchell on or about January 30, 2015.  (Anderson Employment Agreement, attached hereto as **Exhibit A**.)

49.     During the term of his employment at Mitchell and for one year thereafter, Anderson agreed that he would not "solicit, induce, recruit, or encourage any person employed by [Mitchell] to terminate his or her employment."

50.     Anderson further agreed "to comply with his obligations [in] the [APA], including without limitation[,] the restrictive covenants set forth therein."

51.     The Anderson Employment Agreement further prohibited Anderson from "divert[ing] or attempt[ing] to divert from [Mitchell] any business with any customer, client, member, business partner or supplier about which [he] obtained confidential information during his employment with [Mitchell], by using [Mitchell's] trade secrets or by otherwise engaging in conduct that amounts to unfair competition."

52.     As part of the Anderson Employment Agreement, Anderson also executed a *Proprietary Information and Inventions Assignment Agreement* ("**Anderson PIIA Agreement**") with Mitchell on or about January 30, 2015.  (*See* Ex. A.)

53.     In the Anderson PIIA Agreement, Anderson acknowledged and agreed that "during [his] employment and at all times thereafter, [he would] hold the Proprietary Information in strict confidence and [would] not use, reproduce, disclose or deliver, indirectly or indirectly, any Proprietary Information except to the extent necessary to perform [his] duties as an employee."

54.     Anderson further agreed that following the termination of his employment, he would not "use [Mitchell's] Proprietary Information or trade secrets or any other means that would amount to unfair competition to solicit any of [Mitchell's] customers, clients, vendors, business partners, or suppliers, or otherwise interfere with any business relationship or contract between [Mitchell] and any of its customers, clients, vendors, business parties, or suppliers."

55.     As part of the Anderson PIIA Agreement, Anderson was required to disclose any knowledge about Mitchell or Mitchell's proprietary information, other than through the course of being hired, that he had learned prior to his employment at Mitchell.

56.     Anderson identified, and thus warranted he had no prior knowledge of any of Mitchell's proprietary information.

57.     The Anderson PIIA Agreement also required Anderson to identify "a complete and accurate list of all Inventions made, conceived, discovered or developed prior to [his] employment with [Mitchell]" to be excluded from the Anderson PIIA Agreement.

58.     Although Anderson identified prior inventions relating to PBM and RCM services, he did so upon clarification that his inventions were for a business called Image Ally, LLC and applied "solely to the extent such Inventions were not otherwise used by Cogent Works, Auto Rx, Comp Today or Cogent Care in the operation of their respective businesses."

59.     Anderson also agreed in the Anderson PIIA Agreement to use his "best efforts to prevent the unauthorized use, reproduction, disclosure or delivery of [Mitchell's] Proprietary Information by others."

60.     Anderson resigned from Mitchell on March 2, 2017. He is now employed by HealthLift as its President and CEO.

61.     Prior to his departure and while still employed at Mitchell, Anderson caused to be sent to his personal email address Mitchell's confidential and proprietary trade secret information, including the details of Mitchell's contract details with Walgreens. By doing so Anderson breached his contractual obligations and Mitchell's internal policies.

62.     Prior to his departure and while still employed at Mitchell, upon information and belief, and contrary to his contractual obligations and Mitchell's internal policies, Anderson created, used, and/or accessed a Dropbox file containing Mitchell's confidential and proprietary trade secret information, including the details of Mitchell's contract details and pricing comparisons.

63.     Mitchell never relieved Anderson of his obligations set forth in the Anderson Employment Agreement or Anderson PIIA Agreement.

**Defendant Natalie Neil**

64.    Neil began her employment with Mitchell in or around January 30, 2015, serving as Senior Director of Operations of Mitchell's Pharmacy Solutions division.

65.    In her role as Senior Director of Operations, Pharmacy Solutions, Neil had access to and did access competitively sensitive and intimate details of Mitchell's business, including details related to its ongoing business engagement with Walgreens.

66.    In her role as Senior Director of Operations, Pharmacy Solutions, Neil had access to and did access Mitchell's confidential and proprietary trade secret information related to the PBM and RCM services it provides.  This includes but is not limited to its strategic plans for developing and marketing its products and services; its database of customers and clients, including their transaction history, metrics, contracts, and pricing arrangements; underwriting processes, including the specific electronic rules by which Mitchell chooses to accept or reject a pharmacy prescription submission to Mitchell; proprietary processes and procedures related to the verification of claim coverage and the specific processes to collect on compensable claims for specific insurance carriers; pricing details, corresponding workflow, and network agreements with Mitchell's own pharmacy benefit management solution as well as with outside pharmacy benefit management solutions; and software and computer programs.

67.    Neil executed a *Proprietary Information and Inventions Agreement for Employee* ("**Neil PIIA Agreement**") with Mitchell on February 3, 2015.  (Neil PIIA Agreement, attached hereto as **Exhibit B**.)

68.    In the Neil PIIA Agreement, Neil acknowledged and agreed that, "during [her] employment with Mitchell and after the termination of such employment, [she would] keep in

confidence and [would] not use or disclose any Proprietary Information or Third Party

Information or anything directly related to it, except as required in the ordinary course of

performing [her] work for Mitchell, or with Mitchell's prior written approval."

      69.    Neil further agreed that she would use her "best efforts to prevent the

unauthorized reproduction, disclosure or use of any Proprietary Information or Third Party

Information that is not known by the trade generally."

      70.    Neil also agreed that she would "not disclose to anyone, other than Mitchell's

officers, agents or authorized employees, unless otherwise directed in writing by Mitchell's

department head, . . . any of Mitchell's . . . confidential information or trade secrets, whether

developed before or after the date of the [Neil PIIA Agreement]," including Mitchell's

"[c]ustomer lists, call lists, marketing and sales information," "software and software programs,

[and] confidential research and development data and information."

      71.    Neil further agreed that the Neil PIIA Agreement's provisions survived her

termination for any reason whatsoever.

      72.    In addition to the Neil PIIA Agreement, Neil further agreed to "observe and

adhere" to "Mitchell's Standards of Business Conduct."

      73.    Neil acknowledged that she had received and read Mitchell's Standards of

Business Conduct on February 3, 2015.

      74.    Pursuant to Mitchell's Standards of Business Conduct, Neil agreed that, both

during and after her employment with Mitchell, she would "keep secret and retain in strict

confidence all [of Mitchell's Confidential and Proprietary Information]," which included,

without limitation, Mitchell's "customer lists, subscription lists, details of author or consultant

contracts, pricing policies, financial statements, projections, marketing plans or strategies, new product developments or plans . . . trade secrets, operation methods, software and computer programs."

75.     Neil resigned from Mitchell on July 4, 2017, and, upon information and belief, she is now employed at HealthLift.

76.     Prior to her departure, while still employed at Mitchell, Neil breached her obligations to Mitchell by sending outside the company Mitchell's proprietary and trade secret information, including a comparison of Mitchell's contract and pricing details and comparisons for Walgreens.

77.     Also prior to her departure and while still employed at Mitchell, upon information and belief, and contrary to her contractual obligations and Mitchell's internal policies, Neil created, used, and/or accessed a Dropbox file containing Mitchell's confidential and proprietary trade secret information, including the details of Mitchell's contract details and pricing comparisons.

78.     Mitchell never relieved Neil of her obligations set forth in the Neil PIIA Agreement or Mitchell's Standards of Business Conduct.

**Defendant Joseph Noll**

79.     When Mitchell entered into the APA, Noll was employed as Cogent's Vice President of National Accounts.

80.     Following the Closing, on or about February 3, 2015, Noll became employed at Mitchell in a senior strategic sales position in Mitchell's Pharmacy Solutions division. Noll's title became Director, Strategic Partners in Mitchell's Pharmacy Solutions division.

81.    As Director, Strategic Partners in Mitchell's Pharmacy Solutions division, Noll had access to and did access competitively sensitive and intimate details of Mitchell's business, including details related to its ongoing business engagement with Walgreens.

82.    As Director, Strategic Partners, Noll interacted with Mitchell's existing and potential customers and had access to and did access Mitchell's confidential and proprietary trade secret information related to the PBM and RCM services it provides.  This information includes but is not limited to, its strategic plans for developing and marketing its products and services; its database of customers and clients, including their transaction history, metrics, contracts, and pricing arrangements; underwriting processes, including the specific electronic rules by which Mitchell chooses to accept or reject a pharmacy prescription submission to Mitchell; proprietary processes and procedures related to the verification of claim coverage and the specific processes to collect on compensable claims for specific insurance carriers; pricing details, corresponding workflow, and network agreements with Mitchell's own pharmacy benefit management solution as well as with outside pharmacy benefit management solutions; and software and computer programs.

83.    Noll executed a *Proprietary Information and Inventions Agreement* (**"Noll PIIA Agreement"**) with Mitchell on or about February 3, 2015.  (Noll PIIA Agreement, attached hereto as **Exhibit C**.)

84.    In the Noll PIIA Agreement, Noll acknowledged and agreed that, "during [his] employment with Mitchell and after the termination of such employment, [he would] keep in confidence and [would] not use or disclose any Proprietary Information or Third Party

Information or anything directly related to it, except as required in the ordinary course of performing [his] work for Mitchell, or with Mitchell's prior written approval."

85.     Noll further agreed that he would use his "best efforts to prevent the unauthorized reproduction, disclosure or use of any Proprietary Information or Third Party Information that is not known by the trade generally."

86.     Noll also agreed that he would "not disclose to anyone, other than Mitchell's officers, agents or authorized employees, unless otherwise directed in writing by Mitchell's department head, . . . any of Mitchell's . . . confidential information or trade secrets, whether developed before or after the date of the [Noll PIIA Agreement]," including Mitchell's "[c]ustomer lists, call lists, marketing and sales information," "software and software programs, [and] confidential research and development data and information."

87.     Noll further agreed that the Noll PIIA Agreement's provisions survived his termination for any reason whatsoever.

88.     In addition to the Noll PIIA Agreement, Noll further agreed to "observe and adhere" to "Mitchell's Standards of Business Conduct."

89.     Noll acknowledged that he had received and read Mitchell's Standards of Business Conduct on February 3, 2015.

90.     Pursuant to Mitchell's Standards of Business Conduct, Noll agreed that, both during and after his employment with Mitchell, he would "keep secret and retain in strict confidence all [of Mitchell's Confidential and Proprietary Information]," which included, without limitation, Mitchell's "customer lists, subscription lists, details of author or consultant contracts, pricing policies, financial statements, projections, marketing plans or strategies, new

product developments or plans . . . trade secrets, operation methods, software and computer programs."

91.     Noll resigned from Mitchell on February 17, 2018, and, upon information and belief, he is now employed at HealthLift.

92.     Prior to his departure and while still employed at Mitchell, Noll sent outside of the company Mitchell's proprietary and trade secret information, including a comparison of Mitchell's contract and pricing details and comparisons for Walgreens.

93.     Also prior to his departure and while still employed at Mitchell, upon information and belief, and contrary to his contractual obligations and Mitchell's internal policies, Noll created, used, and/or accessed a Dropbox file containing Mitchell's confidential and proprietary trade secret information, including the details of Mitchell's contract details and pricing comparisons.

94.     Mitchell never relieved Noll of his obligations set forth in the Noll PIIA Agreement or Mitchell's Standards of Business Conduct.

**The Creation of HealthLift to Compete with Mitchell and Divert Walgreens' Business from Mitchell**

95.     Despite their contractual obligations to Mitchell, both before and after their employment with Mitchell, Anderson, Neil, Noll, and others embarked upon a course of conduct with a singular purpose: to unfairly compete with Mitchell by soliciting away Mitchell's business with Walgreens using Mitchell's proprietary information.

96.     Upon information and belief, HealthLift could not have implemented a profitable national RCM system for workers' compensation and auto casualty claims in four months without using Mitchell's confidential and proprietary trade secret information.

\4820-7240-8223                                          18

97.    Since leaving Mitchell, Anderson, Neil, and Noll have used Mitchell's confidential and proprietary trade secret information to solicit away Walgreens, Mitchell's customer with whom they had contact, involvement, and responsibility during their employment with Mitchell.  HealthLift is now providing the same services to Walgreens that Mitchell used to provide to it while Anderson, Neil and Noll were employed by Mitchell.  This has resulted in millions of dollars of lost revenue to Mitchell.

98.    Specifically, on June 19, 2018, Walgreens, through an intent to bid notification, issued a Request for Proposals (the "**RFP**") for RCM services in which Walgreens sought proposals to implement a system for processing and receiving payment for workers' compensation prescriptions.

99.    At the time, Mitchell was the incumbent processor for Walgreens workers' compensation prescriptions claims, and Mitchell owned, hosted, and maintained the employer database used to service Walgreens prescriptions.

100.    Mitchell also provided a web-based employer search tool used by Walgreens employees to access Mitchell's database to search for employer information.

101.    Parties responding to the RFP were required to submit an intent to bid to Walgreens by June 21, 2018, and proposals responsive to the RFP were due by July 5, 2018.

102.    Mitchell submitted its Intent to Bid on June 20, 2018.  Mitchell submitted its responsive proposal to Walgreens on July 5, 2018.

103.    Anderson registered HealthLift with the State of Utah on June 28, 2018—eight days after **Walgreens' initial Intent to Bid deadline.**

104.    On August 6, 2018, over a month after the initial July 5, 2018 deadline to file a response to Walgreens' RFP, Walgreens unexpectedly modified the scope of its RFP request to include a system for processing and receiving payment for auto insurance claims (the "**Revised RFP**").

105.    Upon information and belief, Anderson contacted Walgreens and requested that it allow HealthLift to organize and prepare a response to Walgreens' RFP, notwithstanding the original July 5, 2018 RFP deadline.

106.    Upon information and belief, HealthLift also requested that Walgreens modify the RFP to include the supplemental request for a system for processing and receiving payment for auto insurance claims, which Walgreens did.

107.    Upon information and belief, HealthLift requested also that Walgreens revise the initial RFP to incorporate auto insurance claims because HealthLift could not make a meaningful profit processing and receiving payments solely for workers' compensation prescriptions.

108.    Both Mitchell and HealthLift filed responses to the Revised RFP.

109.    Upon information and belief, HealthLift could only have a submitted a successful response to the Revised RFP using information that it and its employees learned and misappropriated from Mitchell.

110.    For instance, before the creation of HealthLift, Mitchell was the only company in the auto casualty industry to process prescriptions for a national pharmacy chain.  Anderson, Neil, and Noll did not have the knowledge or experience to process prescriptions in the auto casualty industry prior to their employment at Mitchell.

111.     Upon information and belief, HealthLift relied on Mitchell's confidential and proprietary trade secret information, including information gained from the emails, contracts, and Dropbox folders that Anderson, Neil, and Noll had sent to themselves, to competitively structure components of its response to the Revised RFP.

112.     Upon information and belief, HealthLift—a company that did not even exist until after the original deadline for indicating an interest in responding to Walgreens' RFP—lacked the knowledge, expertise, and ability to profitably process prescription claims in the auto casualty industry but for the misappropriation of Mitchell's confidential and proprietary trade secret information.

113.     On September 14, 2018, Walgreens informed Mitchell that Walgreens had selected HealthLift as the successful bidder of the Revised RFP.

114.     On September 30, 2018, Walgreens informed Mitchell further that HealthLift's processing system would be implemented by January 2019.

115.     Upon information and belief, while they were still employed at Mitchell, Anderson, Neil, and Noll anticipated creating a competing entity and soliciting away the Walgreens relationship from Mitchell once their respective restrictive covenants had expired.

116.     Following the RFP bidding process, Walgreens terminated its *Claim Processing and Direct Payment Agreement* dated July 1, 2014, and its *Letter Agreement for Retail Personal Injury Protective Prescription Services* dated December 1, 2013, two contracts with Walgreens that Mitchell had purchased pursuant to the APA.

117.     Mitchell stopped processing Walgreens pharmacy workers' compensation and auto casualty claims on January 29, 2019.

118. Based on information and belief, Anderson, Neil, and Noll provided HealthLift with Mitchell's confidential and proprietary trade secret information in order to enable HealthLift to place a competitive bid in response to the RFP and Revised RFP.

119. Indeed, at the time of the RFP Bid, HealthLift was newly-created, had no intellectual property of its own, and had no business history. All of Cogent's and Cogent's Subsidiaries' intellectual property had been sold to Mitchell. In the APA, Anderson warranted and represented that Cogent and Cogent's Subsidiaries did not own any other intellectual property or inventions related to their business.

120. In the APA, in addition to acquiring all intellectual property, Mitchell had also acquired Cogent's and Cogent's Subsidiaries' good will and business relationships (specifically its business relationship with Walgreens) for approximately $77 million, rendering Cogent and Cogent's Subsidiaries—as well as their owner and principal Anderson and all employees—without the intellectual property, good will, and business relationships necessary to compete with Mitchell.

121. HealthLift could not have successfully bid for Walgreens' RFP or Revised RFP, or implemented a profitable national RCM system for workers' compensation and auto casualty claims without using Mitchell's confidential and proprietary trade secret information, including both intellectual property that Mitchell had purchased from Cogent and Cogent's Subsidiaries and confidential and proprietary trade secret information Mitchell had developed prior and subsequent to the APA.

122.    Upon information and belief, after they left Mitchell, Anderson, Neil, and Noll disclosed and used, and have continued disclosing and using, Mitchell's confidential and proprietary trade secret information to benefit HealthLift, Mitchell's competitor.

123.    Given the nature of Anderson's, Neil's, and Noll's employment with HealthLift, and HealthLift's ongoing competition with Mitchell, including its current business with Walgreens, Defendants' continued use and disclosure of Mitchell's confidential and proprietary trade secret information was and remains inevitable.

124.    Defendants' wrongful conduct has caused and is continuing to cause substantial harm to Mitchell.

125.    Specifically, in addition to money damages, as a consequence of Mitchell losing its business with Walgreens, Mitchell has lost over thirty employees who primarily managed and serviced Mitchell's account with Walgreens.  Upon information and belief, fifteen of those employees who left Mitchell, including seven director-level employees, are now employed by HealthLift, doing the same work—servicing the Walgreens account—that they were doing at Mitchell.

## COUNT I
### Breach of Contract
### (Anderson)

126.    Mitchell incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

127.    Mitchell has fully performed its obligations under the APA and the Anderson PIIA Agreement.

128.    The APA and the Anderson PIIA Agreement are enforceable contracts.

129.    Anderson breached his contractual obligations to Mitchell in at least the following ways: disclosing or using Mitchell's confidential and proprietary trade secret information both before and following the termination of his employment; failing to use his best efforts to prevent others from doing so; using intellectual property that he and his companies had sold to Mitchell; diverting Walgreens' business away from Mitchell; and using Mitchell's confidential and proprietary trade secret information to plan and create HealthLift.

130.    Anderson's breaches of the APA and the Anderson PIIA Agreement are material.

131.    Anderson's wrongful conduct is the direct and proximate cause of damages to Mitchell in an amount that is not now presently ascertainable, but exceeds $75,000 and will be established during the course of litigation.

## COUNT II
### Breach of Contract
### (Neil)

132.    Mitchell incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

133.    Mitchell has fully performed its obligations under the Neil PIIA Agreement and Mitchell's Standards of Conduct.

134.    The Neil PIIA Agreement and Mitchell's Standards of Conduct are enforceable contracts.

135.    Neil breached her contractual obligations to Mitchell in at least the following ways:  disclosing and using Mitchell's confidential and proprietary trade secret information to plan and create HealthLift and to compete with Mitchell; allowing others (including Anderson

and Noll) to disclose and use Mitchell's confidential and proprietary trade secret information; and soliciting, diverting, or enticing away Walgreens from Mitchell.

136.    Neil's breaches of the Neil PIIA Agreement and Mitchell's Standards of Conduct are material.

137.    Neil's wrongful conduct is the direct and proximate cause of damages to Mitchell in an amount that is not now presently ascertainable, but exceeds $75,000 and will be established during the course of litigation.

## COUNT III
### Breach of Contract
### (Noll)

138.    Mitchell incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

139.    Mitchell has fully performed its obligations under the Noll PIIA Agreement and Mitchell's Standards of Conduct.

140.    The Noll PIIA Agreement and Mitchell's Standards of Conduct are enforceable contracts.

141.    Noll breached his contractual obligations to Mitchell in at least the following ways:  disclosing and using Mitchell's confidential and proprietary trade secret information to plan and create HealthLift and to compete with Mitchell; allowing others (including Anderson and Neil) to disclose and use Mitchell's confidential and proprietary trade secret information; and soliciting, diverting, or enticing away Walgreens from Mitchell.

142.    Noll's breaches of the Noll PIIA Agreement and Mitchell's Standards of Conduct are material.

143.    Noll's wrongful conduct is the direct and proximate cause of damages to Mitchell in an amount that is not now presently ascertainable, but exceeds $75,000 and will be established during the course of litigation.

## COUNT IV
### Tortious Interference with Prospective Economic Advantage
### (HealthLift)

144.    Mitchell incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

145.    The APA, Anderson PIIA Agreement, Neil PIIA Agreement, Noll PIIA Agreement, and Mitchell's Standards of Conduct contain certain covenants specifically providing that during and after employment with Mitchell, Anderson, Neil, and Noll would not use or disclose Mitchell's confidential and proprietary trade secret information.

146.    HealthLift knew or should have known of the existence of the obligations in the APA, Anderson PIIA Agreement, Neil PIIA Agreement, Noll PIIA Agreement, and Mitchell's Standards of Conduct.

147.    Despite such knowledge, HealthLift permitted, caused, encouraged, and/or induced Anderson, Neil, and/or Noll to breach the obligations contained in the APA, Anderson PIIA Agreement, Neil PIIA Agreement, Noll PIIA Agreement, and Mitchell's Standards of Conduct.

148.    HealthLift has knowingly and intentionally enjoyed the economic benefits of these breaches.

149.    There was no privilege or justification for HealthLift's conduct.

150.    By permitting, causing, encouraging, and/or inducing Anderson, Neil, and/or Noll to breach their respective contracts with Mitchell, HealthLift has tortiously interfered with Mitchell's rights under those contracts.

151.    HealthLift engaged in the improper conduct complained of in this Complaint in an intentional, willful, and malicious manner, involving improper means.  HealthLift sought to injure Mitchell and unfairly reap the benefits of Mitchell's efforts, including the development of its confidential and proprietary trade secret information.

152.    As a direct and proximate result of HealthLift's wrongful conduct, Mitchell has suffered and continues to suffer damages in an amount that is not now presently ascertainable, but exceeds $75,000, and will be established during the course of litigation.

## COUNT V
### Misappropriation of Trade Secrets, Utah Code Ann. §§ 13-24-1 to -9
### (All Defendants)

153.    Mitchell incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

154.    Mitchell owns confidential and proprietary trade secret information that provides it with a commercial advantage because it is not generally known in the industry in which Mitchell does business, nor is it readily or publicly ascertainable outside the company by proper means.

155.    Mitchell's confidential and proprietary trade secret information related to the PBM and RCM services it provides.  This information includes but is not limited to, its strategic plans for developing and marketing its products and services; its database of customers and clients, including their transaction history, metrics, contracts, and pricing arrangements;

underwriting processes, including the specific electronic rules by which Mitchell chooses to accept or reject a pharmacy prescription submission to Mitchell; proprietary processes and procedures related to the verification of claim coverage and the specific processes to collect on compensable claims for specific insurance carriers; pricing details, corresponding workflow, and network agreements with Mitchell's own pharmacy benefit management solution as well as with outside pharmacy benefit management solutions; and software and computer programs.

156.     Mitchell has taken reasonable steps to protect its confidential and proprietary trade secret information, including without limitation, limiting access to its information to employees engaging in Mitchell's business and entering into agreements with those who have access to such information requiring that they maintain its confidentiality.

157.     HealthLift, Anderson, Neil, and Noll have used improper means to appropriate Mitchell's confidential and proprietary trade secret information for themselves and for the benefit of others.

158.     As a direct and proximate result of the wrongful conduct of HealthLift, Anderson, Neil, and Noll, Mitchell has suffered and continues to suffer damages in an amount that is not now presently ascertainable, but exceeds $75,000 and will be established during the course of litigation.

159.     Defendants' misappropriation of Mitchell's confidential and proprietary trade secret information was willful and malicious, entitling Mitchell to double exemplary damages and reasonable attorneys' fees.

## COUNT VI
### Tortious Interference with Economic Relations
### (All Defendants)

160.     Mitchell incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

161.     Mitchell had existing business relationships with Walgreens and had a continued expectancy of providing claims processing and management services for Walgreens.

162.     Defendants intentionally and improperly interfered with Mitchell's valid business expectancy with Walgreens.  They did so through improper means, including allowing, soliciting, and enticing each other to breach their agreements with Mitchell by improperly using and disclosing Mitchell's confidential and proprietary trade secret information in order to cause Walgreens to issue and modify its RFP in ways tailored to HealthLift's particular needs, and to cancel its ongoing contracts with Mitchell.

163.     Defendants have knowingly and intentionally enjoyed the economic benefits of these breaches.

164.     There was no privilege or justification for Defendants' conduct.

165.     As a direct and proximate result of Defendants' acts of tortious interference with Mitchell's business relationships and expectancies, Mitchell has suffered and continues to suffer damages in an amount that is not now presently ascertainable, but exceeds $75,000 and which will be established during the course of litigation.

## COUNT VII
### Civil Conspiracy
### (All Defendants)

166.     Mitchell incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

167.     HealthLift, Anderson, Neil, and Noll conspired to use confidential and proprietary trade secrets they learned from Mitchell, as well as intellectual property Cogent sold to Mitchell, to create a business (HealthLift) to unfairly compete with Mitchell and take from Mitchell its existing and future business opportunities, including its business with Walgreens.

168.     HealthLift, Anderson, Neil, and Noll agreed on this course of action.

169.     In furtherance of their plan, Anderson, Neil, and Noll created HealthLift, used and disclosed Mitchell's confidential information and proprietary trade secrets, and enticed Mitchell's customers to do business with HealthLift, rather than Mitchell.

170.     As a direct and proximate result of Defendants' civil conspiracy, Mitchell has suffered and continues to suffer damages in an amount that is not presently ascertainable, but exceeds $75,000 and which will be established during the course of litigation.

WHEREFORE, Mitchell prays for entry of judgment as follows:

A.     That this Court order Defendants to immediately cease using and return to Mitchell any confidential and proprietary trade secret information and intellectual property;

B.     That this Court order Defendants to provide a comprehensive description to Mitchell of all of Mitchell's confidential and proprietary trade secret information and intellectual property provided by Anderson, Neil, or Noll to HealthLift;

C.     That judgment be entered in favor of Mitchell and against Defendants for all compensatory and related damages in an amount to be determined herein;

D.     That judgment be entered for Mitchell and against Defendants for punitive and/or exemplary damages in an amount to be determined;

\4820-7240-8223                                    30

E.      That this Court permanently enjoin Defendants from any continued wrongful use of Mitchell's proprietary and/or confidential information, including to compete with it;

F.      That Mitchell be awarded all of the costs and fees to which it may be entitled under common law, contract and statute; and

G.      For such other and further relief that this Court deems just and proper.

DATED:  September 9, 2019.

SNELL & WILMER L.L.P.


*/s/ Mark O. Morris*
Mark O. Morris
Bret R. Evans

*Attorneys for Plaintiff*


Plaintiff's Address:
6220 Greenwich Drive
San Diego, CA

JS 44 (Rev 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Mitchell International, Inc.

## DEFENDANTS

Healthlift Pharmacy Services, LLC; Brian Anderson; Natalie Neil; and Joseph Noli

**(b)** County of Residence of First Listed Plaintiff  San Diego County, CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Salt Lake County, UT
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Mark O. Morris, Bret R. Evans
Snell & Wilmer L.L.P.
15 W. South Temple, Ste. 1200; Salt Lake City, Utah 84101

Attorneys *(If Known)*
Mark Bettilyon
Thorpe North & Western, LLP
175 S. Main St., Ste. 900; SLC, UT 84111 (counsel for Healthlift)

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | Protection Act |
| ☒ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | Exchange |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | | Leave Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332 (Diversity)

Brief description of cause:
Breach of Contract and Misappropriation of Trade Secrets

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F R Cv P

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*
JUDGE                                    DOCKET NUMBER

DATE  September 9, 2019

SIGNATURE OF ATTORNEY OF RECORD

### FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP

Case: 2:19-cv-00637
Assigned To : Shelby, Robert J.
Assign. Date : 9/9/2019
Description: Mitchell International v.
HealthLift Pharmacy Services et al

# EXHIBIT A

### EXECUTIVE EMPLOYMENT AGREEMENT

This Executive Employment Agreement (this "**Agreement**"), effective as of the date provided in Section I.A below, is between MITCHELL INTERNATIONAL, INC. (the "**Company**"), and MR. BRIAN ANDERSON ("**Executive**") (collectively, the "**parties**").

WHEREAS, the Company is entering into an Asset Purchase Agreement (the "**Asset Purchase Agreement**") to acquire substantially all of the tangible and intangible assets of Cogent Works, LC and certain of its subsidiaries (the "**Transaction**").

WHEREAS, the parties wish to provide for Executive's full-time employment with Company following the Transaction.

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### I.    TERM; POSITION AND RESPONSIBILITIES

**A.    Term of Agreement.** This Agreement will become effective upon the Closing (as defined in the Asset Purchase Agreement) and will remain in effect until the two (2) year anniversary of the Closing, unless terminated earlier in accordance with Sections III or IV below (the "**Term**"). The Term may be extended by express mutual written agreement of the parties.

**B.    Position.** As of the Closing, the Company will employ Executive full-time in the position of Vice President and General Manager of Cogent Works, a division of the Company. During the term of Executive's employment with the Company, Executive shall have the responsibility and authority to manage and operate, and to determine the appropriate personnel to manage and operate, the Earn-Out Business (as defined in the Asset Purchase Agreement), and to make certain business decisions for the Earn-Out Business including but not limited to decisions regarding accounting, capital expenditures, technology and strategy, all within and subject to the Earn-Out Budget (as defined in the Asset Purchase Agreement) as may be adjusted by the Oversight Committee (as defined in the Asset Purchase Agreement), provided, further, that: (i) Executive's authority shall be commensurate with the authority of executives with similar roles at the Company and shall be subject to customary principles of corporate governance; and (ii) Executive shall obtain the consent of the Oversight Committee prior to making any material deviation in the conduct of the Earn-Out Business from the Earn-Out Budget including matters related to accounting, capital expenditures, technology or strategy. Executive will abide by the rules, regulations, and practices of the Company as adopted or modified from time to time by the Company. The parties agree that the sole and exclusive remedy and recourse for any breach of this Section I.B. by the Company shall be as set forth in, and subject to the terms of, Section III.B. hereof; provided that nothing herein shall amend or terminate the rights or obligations of Executive and Executive's affiliates set forth in the Asset Purchase Agreement.

**C.    Other Activities.** Except upon the prior written consent of the Company, Executive will not, during the Term, (i) accept any other employment, or (ii) engage, directly or indirectly, in any other business activity (whether or not pursued for pecuniary advantage) that might interfere with Executive's duties and responsibilities hereunder or create a conflict of interest with the Company.

**D.**    **No Conflict.** Executive represents and warrants that Executive's execution of this Agreement, employment with the Company, and the performance of Executive's proposed duties under this Agreement will not violate any obligations Executive may have to any other employer, person or entity, including any obligations with respect to proprietary or confidential information of any other person or entity.

## II.    COMPENSATION AND BENEFITS

**A.**    **Base Salary.** The Company will pay Executive a salary at the rate of Two Hundred and Twenty-Two Thousand Dollars ($222,000) per year ("**Base Salary**"). The Base Salary will be paid in accordance with the Company's regularly established payroll practice. The Base Salary shall be subject to annual review and adjustment by the Company commensurate with Executive's performance and responsibilities; provided, however, that the Base Salary may not be reduced below Two Hundred and Twenty-Two Thousand Dollars ($222,000) per year.

**B.**    **Bonus.** Executive will be eligible to participate in a management incentive bonus plan based on performance objectives with an initial annual target incentive opportunity of Seventy-Eight Thousand Dollars ($78,000); provided, however, that such annual target incentive opportunity may not be reduced below Seventy-Eight Thousand Dollars ($78,000). Such annual target incentive opportunity shall be subject to annual review and adjustment by the Company to make such target incentive opportunity commensurate with Executive's performance and scope of responsibilities.

**C.**    **Benefits.** Executive shall be eligible to participate in all retirement, savings, fringe benefit, disability insurance, group health and group life, vacation, and similar health and benefit plans maintained by the Company in accordance with the terms and conditions thereof on a basis which is no less favorable than that applicable to the Company's vice presidents and general managers. Executive shall be subject to the Company's regular vacation, holiday, sick leave, payroll, expense account and other employment policies, as amended from time to time, at a level equivalent to that of the Company's vice presidents and general managers.

**D.**    **Corporate Lodging.** During the Term, the Company will reimburse Executive for actual costs incurred by Executive in obtaining corporate lodging in California, up to a maximum reimbursement of Three Thousand Dollars ($3,000) per month and subject to an aggregate cap of Thirty-Six Thousand Dollars ($36,000). For avoidance of doubt, this reimbursement arrangement will terminate by the two (2) year anniversary of the Closing, even if the Term is extended.

**E.**    **Expenses.** The Company will reimburse Executive for reasonable and customary business expenses incurred in the performance of Executive's duties hereunder in accordance with the Company's expense reimbursement guidelines.

## III.    TERMINATION

**A.**    **Termination.** Either party may elect to terminate this Agreement at any time upon written notice to the other party. Upon termination or expiration of this Agreement, all obligations of the Company under this Agreement will cease except as otherwise provided below.

**B.**    **Severance.** If the Company terminates Executive's employment other than for Cause (as defined in Section IV(A) below), or Executive terminates his employment with the Company for Good Reason in accordance with Section III(C) below, Executive will be eligible to receive Severance Pay equal to the greater of (i) twelve (12) months of Executive's Base Salary or (ii) Executive's Base Salary

from the date of such termination until the two (2) year anniversary of the Closing ("**Severance Pay**"). The Severance Pay will be paid in the form of salary continuation on the Company's regular payroll schedule. Executive's eligibility for the Severance Pay is conditioned on Executive executing and delivering a release agreement, in the form attached hereto as Exhibit B (the "**Release**"), within forty-five (45) days following the termination date of Executive's employment with the Company and not revoking the Release during any applicable statutory revocation period; provided that such Release shall not amend or terminate the rights or obligations of Executive and Executive's affiliates set forth in the Asset Purchase Agreement.  If Executive complies with the conditions of the foregoing sentence, the Severance Pay will commence on the sixtieth (60th) day following the termination of Executive's employment with the Company and the first Severance Pay payment will include any Severance Pay amounts that would have been payable during that sixty (60) day period. Executive will not be entitled to any Severance Pay if Executive's employment is terminated For Cause, By Death or By Disability (as defined in Section IV below) or if Executive's employment is terminated by Executive other than for Good Reason.

      **C.**    **Good Reason.** Executive's termination will be for "Good Reason" if Executive provides written notice to the Company of the Good Reason within ninety (90) days of the event constituting Good Reason and provides the Company with a period of thirty (30) days to cure the Good Reason and the Company fails to cure the Good Reason within that period. In such event Executive may terminate his employment for Good Reason, in which case Executive will be eligible to receive Severance Pay in accordance with the terms and conditions set forth in Section III(B) above. For purposes of this Agreement, "**Good Reason**" means any of the following events if the event is effected by the Company without the consent of Executive: (A) a material reduction in Executive's authority, level of responsibility, policy making functions, or duties; (B) a material reduction in Executive's Base Salary; (C) a breach by the Company of any material provision of this Agreement; or (D) the Company requiring a change in the location of Executive's principal place of employment of more than fifty (50) miles; provided further that reasonable travel of up to 33% of Executive's time required by the Company shall not constitute a "relocation" for the purpose of this clause

## IV.    OTHER TERMINATIONS BY COMPANY

      **A.**    **Termination for Cause.** For purposes of this Agreement, "For Cause" means:
(i) Executive is convicted of a crime involving dishonesty, breach of trust, or physical harm to any person; (ii) Executive willfully engages in conduct that is in bad faith and materially injurious to the Company, including but not limited to, misappropriation of trade secrets, fraud or embezzlement; (iii) Executive commits a material breach of this Agreement or any other agreement between Executive and the Company, which breach is not cured within twenty days after written notice to Executive from the Company; (iv) Executive willfully refuses to implement or follow a lawful policy or directive of the Company, which breach is not cured within twenty days after written notice to Executive from the Company; or (v) Executive engages in misfeasance or malfeasance demonstrated by a pattern of failure to perform job duties diligently and professionally; provided, however, that no termination of Executive's employment shall be For Cause until there shall have been delivered to Executive a copy of a written notice setting forth that Executive was guilty of the conduct set forth and specifying the particulars thereof in detail. The Company will pay to Executive all compensation to which Executive is entitled up through the date of termination, subject to any other rights or remedies of the Company under law; and thereafter all obligations of the Company under this Agreement will cease.

      **B.**    **By Death.** Executive's employment will terminate automatically upon Executive's death. The Company will pay to Executive's beneficiaries or estate, as appropriate, any compensation then due and owing. Thereafter all obligations of the Company under this Agreement will cease. Nothing in this

pa-1662488

Section affects any entitlement of Executive's heirs or devisees to the benefits of any life insurance plan or other applicable benefits.

       **C.**    **By Disability.** If Executive becomes eligible for the Company's long term disability benefits or if, in the sole opinion of the Company, Executive is unable to carry out the responsibilities and functions of the position held by Executive by reason of any physical or mental impairment for more than ninety consecutive days or more than one hundred and twenty days in any twelve-month period, then, to the extent permitted by law, the Company may terminate Executive's employment. The Company will pay to Executive all compensation to which Executive is entitled up through the date of termination, and thereafter all obligations of the Company under this Agreement will cease. Nothing in this Section affects Executive's rights under any disability plan in which Executive is a participant.

## V.    TERMINATION OBLIGATIONS

       **A.**    **Return of Property.** Executive agrees that all property (including without limitation all equipment, tangible proprietary information, documents, records, notes, contracts and computer-generated materials) furnished to or created or prepared by Executive incident to Executive's employment belongs to the Company and will be promptly returned to the Company upon termination of Executive's employment.

       **B.**    **Resignation and Cooperation.** Upon termination of Executive's employment, Executive will be deemed to have resigned from all offices and directorships then held with the Company. Following any termination of employment, Executive will reasonably cooperate with the Company in the winding up of pending work on behalf of the Company and the orderly transfer of work to other employees. Executive will also reasonably cooperate with the Company in the defense of any action brought by any third party against the Company that relates to Executive's employment by the Company.

## VI.    INVENTIONS AND PROPRIETARY INFORMATION; PROHIBITION ON THIRD PARTY INFORMATION

       **A.**    **Proprietary Information Agreement.** Executive agrees to sign and be bound by the terms of the Company's Proprietary Information and Inventions Assignment Agreement, which is attached as Exhibit A ("**Proprietary Information Agreement**").

       **B.**    **Asset Purchase Agreement.** Executive agrees to comply with his obligations the Asset Purchase Agreement executed in connection with the Transaction, including without limitation the restrictive covenants set forth therein, and acknowledges that such obligations survive any termination of this Agreement.

       **C.**    **Non-Solicitation.** Executive acknowledges that because of Executive's position in the Company, Executive will have access to material intellectual property and confidential information. During the term of Executive's employment and for one (1) year thereafter, in addition to Executive's other obligations hereunder or under the Proprietary Information Agreement or the Asset Purchase Agreement, Executive will not, for Executive or any third party, directly or indirectly (i) solicit, induce, recruit or encourage any person employed by the Company to terminate his or her employment, or (ii) divert or attempt to divert from the Company any business with any customer, client, member, business partner or supplier about which Executive obtained confidential information during his employment with the Company, by using the Company's trade secrets or by otherwise engaging in conduct that amounts to unfair competition.

4

## VII.   AMENDMENTS; WAIVERS; REMEDIES

This Agreement may not be amended or waived except by a writing signed by Executive and by a duly authorized representative of the Company other than Executive. Failure to exercise any right under this Agreement will not constitute a waiver of such right. Any waiver of any breach of this Agreement will not operate as a waiver of any subsequent breaches. All rights or remedies specified for a party herein will be cumulative and in addition to all other rights and remedies of the party hereunder or under applicable law.

## VIII.   ASSIGNMENT; BINDING EFFECT

**A.     Assignment.** The performance of Executive is personal hereunder, and Executive agrees that Executive will have no right to assign and will not assign or purport to assign any rights or obligations under this Agreement. This Agreement may be assigned or transferred by the Company; and nothing in this Agreement will prevent the consolidation, merger or sale of the Company or a sale of any or all or substantially all of its assets, the Purchased Assets (as defined in the Asset Purchase Agreement) or of the Earn-Out Business.

**B.     Binding Effect.** Subject to the foregoing restriction on assignment by Executive, this Agreement will inure to the benefit of and be binding upon each of the parties; the affiliates, officers, directors, agents, successors and assigns of the Company; and the heirs, devisees, spouses, legal representatives and successors of Executive.

## IX.   NOTICES

All notices or other communications required or permitted hereunder will be made in writing and will be deemed to have been duly given if delivered: (a) by hand; (b) by a nationally recognized overnight courier service; or (c) by United States first class registered or certified mail, return receipt requested, to the principal address of the other party, as set forth below. The date of notice will be deemed to be the earlier of (i) actual receipt of notice by any permitted means, or (ii) five business days following dispatch by overnight delivery service or the United States Mail. Executive will be obligated to notify the Company in writing of any change in Executive's address. Notice of change of address will be effective only when done in accordance with this paragraph.

Company's Notice Address:

Mitchell International, Inc.
6220 Greenwich Drive
San Diego, CA 92122
Attention: General Counsel

Executive's Notice Address:

Brian Anderson
6161 South Murdoch Woods Place
Salt Lake City, Utah 84121

    With a copy to:

    Bruce H. Shapiro, P.C.
    145 South 400 East

5

Salt Lake City, Utah 84111
Attention: Bruce H. Shapiro, Esq.

## X.    SEVERABILITY

If any provision of this Agreement is held by a court or arbitrator to be invalid, unenforceable, or void, such provision will be enforced to the fullest extent permitted by law and the remainder of this Agreement will remain in full force and effect. In the event that the time period or scope of any provision is declared by a court or arbitrator of competent jurisdiction to exceed the maximum time period or scope that such court or arbitrator deems enforceable, then such court or arbitrator will reduce the time period or scope to the maximum time period or scope permitted by law.

## XI.    TAXES

All amounts paid under this Agreement will be paid less all applicable state and federal tax withholdings (if any) and any other withholdings required by any applicable jurisdiction or authorized by Executive. Notwithstanding any other provision of this Agreement whatsoever, the Company, in its sole discretion, will have the right to provide for the application and effects of Section 409A of the Code (relating to deferred compensation arrangements) and any related administrative guidance issued by the Internal Revenue Service. The Company will have the authority to delay the payment of any amounts under this Agreement to the extent it deems necessary or appropriate to comply with Section 409A(a)(2)(B)(i) of the Code (relating to payments made to certain "key employees" of publicly-traded companies); in such event, any such amount to which Executive would otherwise be entitled during the six (6) month period immediately following his termination of employment with the Company will be paid in a lump sum on the date six (6) months and one (1) day following the date of Executive's termination of employment with the Company (or the next business day if such date is not a business day), provided that Executive has complied with the requirements for such payment. Executive will be treated as having a termination of employment under this Agreement only if such termination meets the requirements of a "separation from service" as that term is defined in Section 409A(a)(2)(A)(i) of the Internal Revenue Code of 1986, as amended (the "Code") and Treas. Regs. Section 1.409A-1(h), and as amplified by any other official guidance. This Agreement is intended to comply with the provisions of Code Section 409A; provided, however, that the Company makes no representation that the amounts payable under this Agreement will comply with Code Section 409A and makes no undertaking to prevent Code Section 409A from applying to amounts payable under this Agreement or to mitigate its effects on any deferrals or payments made under this Agreement.

## XII.    COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which will be deemed an original of this Agreement, but all of which together will constitute one and the same instrument.

## XIII.    ENTIRE AGREEMENT

This Agreement is intended to be the final, complete, and exclusive statement of the terms of Executive's employment by the Company and may not be contradicted by evidence of any prior or contemporaneous statements or agreements, except for agreements specifically referenced herein (including the Proprietary Information Agreement and the Asset Purchase Agreement). This Agreement will be governed by and construed in accordance with the laws of the State of Utah.

6

## XIV.   EXECUTIVE ACKNOWLEDGEMENT

EXECUTIVE ACKNOWLEDGES EXECUTIVE HAS HAD THE OPPORTUNITY TO CONSULT LEGAL COUNSEL CONCERNING THIS AGREEMENT, THAT EXECUTIVE HAS READ AND UNDERSTANDS THE AGREEMENT, THAT EXECUTIVE IS FULLY AWARE OF ITS LEGAL EFFECT, AND THAT EXECUTIVE HAS ENTERED INTO IT FREELY BASED ON EXECUTIVE'S OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS OR PROMISES OTHER THAN THOSE CONTAINED IN THIS AGREEMENT.

*[Remainder of page intentionally left blank; signature page to follow]*

pa-1662488

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date below.

**MITCHELL INTERNATIONAL, INC.**                    **BRIAN ANDERSON**

By: _____                      By: _____

Print: Alex Sun                                    Print: Brian Anderson

Title: President and Chief Executive Officer

Date: ___January 30, 2015_____               Date: _____

*[Signature page to Executive Employment Agreement]*

pa-1662488

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date below.

MITCHELL INTERNATIONAL, INC.

By: _____

Print: _____

Title: _____

Date: _____

BRIAN ANDERSON

By: _____

Print: _BRIAN   ANDERSON_

Date: _01/30/15_

*[Signature page to Executive Employment Agreement]*

**Exhibit A**

**Proprietary Information Agreement**

## MITCHELL INTERNATIONAL, INC.

### EMPLOYEE
### PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

Employee Name: __Brian Anderson_____

In consideration of my employment by Mitchell International, Inc., a Delaware corporation (the "Company"), I agree to the restrictions and obligations placed by the Company on my use and development of certain information, technology, ideas, inventions and other materials, as set forth in this Employee Proprietary Information and Invention Assignment Agreement (this "Agreement").

1.    **At-Will Employment.**  I acknowledge that nothing in this Agreement shall be construed to imply that the term of my employment is guaranteed for any period of time.  Unless otherwise stated in a written agreement signed by a duly authorized representative of the Company other than me, my employment is "at-will" and may be terminated with or without cause and with or without notice.

2.    **Proprietary Information.**

(a)    <u>Definition</u>.  "Proprietary Information" means any and all information and materials, in whatever form, tangible or intangible, whether disclosed to or learned or developed by me before or after the execution of this Agreement, whether or not marked or identified as confidential or proprietary, pertaining in any manner to the business of or used by the Company and its affiliates, or pertaining in any manner to any person or entity to whom the Company owes a duty of confidentiality.  Proprietary Information includes, but is not limited to, the following types of information and materials: (i) research, development, technical or engineering information, know-how, data processing or computer software, programs, tools, data, designs, diagrams, drawings, schematics, sketches or other visual representations, plans, projects, manuals, documents, files, photographs, results, specifications, trade secrets, inventions, discoveries, compositions, ideas, concepts, structures, improvements, products, prototypes, instruments, machinery, equipment, processes, formulas, algorithms, methods, techniques, works in process, systems, technologies, disclosures, applications and other materials; (ii) financial information and materials, including, without limitation, information and materials relating to costs, vendors, suppliers, licensors, profits, markets, sales, distributors, joint venture partners, customers, subscribers, members and bids, whether existing or potential; (iii) business and marketing information and materials, including, without limitation, information and materials relating to future development and new product concepts; (iv) personnel files and information about compensation, benefits and other terms of employment of the Company's other employees and independent contractors; and (v) any other information or materials relating to the past, present, planned or foreseeable business, products, developments, technology or activities of the Company.

(b)    <u>Exclusions</u>.  Proprietary Information does not include any information or materials that I can prove by written evidence (i) is or becomes publicly known through lawful means and without breach of this Agreement by me; (ii) was rightfully in my possession or part of my general knowledge prior to my employment by the Company; or (iii) is disclosed to me without confidential or proprietary restrictions by a third party who rightfully possesses the information or materials without confidential or proprietary restrictions.  However, to the extent the Company owes a duty of confidentiality to a third party with respect to such information, idea or material, such information, idea or material shall continue to be Proprietary Information until such time as the Company's duty of confidentiality terminates or expires.  If I am uncertain as to whether particular information or materials are Proprietary Information, I will request the Company's written opinion as to their status.

(c)    <u>Prior Knowledge</u>.  Except as disclosed on <u>Schedule A</u> to this Agreement, to my knowledge, I have no information or materials pertaining in any manner to the business of or used by the

Company and its affiliates, other than information I have learned from the Company in the course of being hired and employed.

**3.      Restrictions on Proprietary Information.**

(a)      <u>Restrictions on Use and Disclosure</u>.  I agree that, during my employment and at all times thereafter, I will hold the Proprietary Information in strict confidence and I will not use, reproduce, disclose or deliver, directly or indirectly, any Proprietary Information except to the extent necessary to perform my duties as an employee of the Company or as permitted by a duly authorized representative of the Company. I will use my best efforts to prevent the unauthorized use, reproduction, disclosure or delivery of Proprietary Information by others.

(b)      <u>Location</u>.  I agree to maintain at my work station and/or any other place under my control only such Proprietary Information as I have a current "need to know."  I agree to return to the appropriate person or location or otherwise properly dispose of Proprietary Information once that need to know no longer exists.

(c)      <u>Third Party Information</u>.  I recognize that the Company has received and will receive Proprietary Information from third parties to whom or which the Company owes a duty of confidentiality.  In addition to the restrictions set forth in this Section 3, I will not use, reproduce, disclose or deliver such Proprietary Information except as permitted by the Company's agreement with such third party.

(d)      <u>Interference with Business</u>.  I acknowledge that, because of my responsibilities at the Company, I will help to develop, and will be exposed to, the Company's business strategies, information on customers and clients, and other valuable Proprietary Information and trade secrets, and that use or disclosure of such Proprietary Information and trade secrets in breach of this Agreement would be extremely difficult to detect or prove.  I also acknowledge that the Company's relationships with its employees, customers, clients, vendors, and other persons are valuable business assets.  Therefore, I agree as follows:

(i)      I shall not, during my employment or for a period of one year following termination of my employment with the Company for any reason, directly or indirectly solicit, induce, recruit, or encourage any officer, director, employee, independent contractor or consultant of the Company who was employed by or affiliated with the Company at the time of my termination to leave the Company or terminate his or her employment or relationship with the Company.

(ii)      I shall not, following the termination of my employment with the Company for any reason, use the Company's Proprietary Information or trade secrets or any other means that would amount to unfair competition to solicit any of the Company's customers, clients, vendors, business partners, or suppliers, or otherwise interfere with any business relationship or contract between the Company and any of its customers, clients, vendors, business partners, or suppliers.

I understand and agree that nothing in this Section 3 limits or modifies in any way my duties under any other Section of this Agreement or any applicable law regarding the Company's Proprietary Information.

**4.      Privacy; Protection of Personal Information.**

(a)      <u>Privacy</u>.  I acknowledge that the Company may access all information and materials generated, received or maintained by or for me on the premises or equipment of the Company (including, without limitation, computer systems and electronic or voice mail systems), and I hereby waive any privacy rights I may have with respect to such information and materials.

(b)      <u>Protection of Personal Information</u>.  During my employment with the Company and thereafter, I shall hold Personal Information in the strictest confidence and shall not disclose or use Personal

Information about other individuals, except in connection with my work for the Company, or unless expressly authorized in writing by an authorized representative of the Company. I understand that there are laws in the United States and other countries that protect Personal Information, and that I must not use Personal Information about other individuals other than for the purposes for which it was originally used or make any disclosures of other individuals' Personal Information to any third party or from one country to another without prior approval of an authorized representative of the Company. I understand that nothing in this Agreement prevents me from discussing my wages or other terms and conditions of my employment with coworkers or others, unless such discussion would be for the purpose of engaging in unfair competition or other unlawful conduct.

      (c)    <u>Definition of Personal Information</u>. "Personal Information" means personally identifiable information about employees, independent contractors or third party individuals, including names, addresses, telephone or facsimile numbers, Social Security Numbers, background information, credit card or banking information, health information, that I receive in connection with performing my duties for the Company.

     **5.**      **Inventions.**

      (a)    <u>Definitions</u>.

      (i)    I understand that the term "Inventions" in this Agreement means any and all ideas, concepts, inventions, discoveries, developments, modifications, improvements, know-how, trade secrets, data, designs, diagrams, plans, specifications, methods, processes, techniques, formulas, algorithms, tools, works of authorship, derivative works, software, content, textual or artistic works, mask works, video, graphics, sound recordings, structures, products, prototypes, systems, applications, creations and technologies in any stage of development, whether or not patentable or reduced to practice and whether or not copyrightable.

      (ii)    I understand that the term "Intellectual Property Rights" in this Agreement means any and all (A) patents, utility models, industrial rights and similar intellectual property rights registered or applied for in the United States and all other countries throughout the world (including all reissues, divisions, continuations, continuations-in-part, renewals, extensions and reexaminations thereof); (B) rights in trademarks, service marks, trade dress, logos, domain names, rights of publicity, trade names and corporate names (whether or not registered) in the United States and all other countries throughout the world, including all registrations and applications for registration of the foregoing and all goodwill related thereto; (C) copyrights (whether or not registered) and rights in works of authorship, databases and mask works, and registrations and applications for registration thereof in the United States and all other countries throughout the world, including all renewals, extensions, reversions or restorations associated with such copyrights, now or hereafter provided by law, regardless of the medium of fixation or means of expression; (D) rights in trade secrets and other confidential information and know-how in the United States and all other countries throughout the world; (E) other intellectual property or proprietary rights in the United States and all other countries throughout the world, including all neighboring rights and sui generis rights; (F) rights to apply for, file, register establish, maintain, extend or renew any of the foregoing; (G) rights to enforce and protect any of the foregoing, including the right to bring legal actions for past, present and future infringement, misappropriation or other violations of any of the foregoing; and (H) rights to transfer and grant licenses and other rights with respect to any of the foregoing, in the Company's sole discretion and without a duty of accounting.

      (b)    <u>Assignment</u>. I hereby assign, and agree to assign automatically upon creation, to the Company, without additional compensation, my entire right, title and interest (including, without limitation, all Intellectual Property Rights) in and to (a) all Inventions that are made, conceived, discovered or developed by me (either alone or jointly with others), or result from or are suggested by any work performed by me (either alone or jointly with others) for or on behalf of the Company or its affiliates, (i) during the period of my

employment with the Company, whether before or after the execution of this Agreement and whether or not made, conceived, discovered or developed during regular business hours or (ii) during or after the period of my employment with the Company, whether before or after the execution of this Agreement, if based on or using Proprietary Information or otherwise in connection with my activities as an employee of the Company (collectively, the "Company Inventions"), and (b) all benefits, privileges, causes of action and remedies relating to the Company Inventions, whether before or hereafter accrued (including, without limitation, the exclusive rights to apply for and maintain all registrations, renewals and/or extensions; to sue for all past, present or future infringements or other violations of any rights in the Invention; and to settle and retain proceeds from any such actions), free and clear of all liens and encumbrances. I agree that all such Company Inventions are the sole property of the Company or any other entity designated by it, and all Intellectual Property Rights shall vest in and inure to the benefit of the Company or such other entity. I agree and acknowledge that all copyrightable Company Inventions shall be considered works made for hire prepared within the scope of my employment. THIS PARAGRAPH DOES NOT APPLY TO ANY INVENTION WHICH QUALIFIES FULLY UNDER THE PROVISIONS OF SECTION 2870 OF THE LABOR CODE OF THE STATE OF CALIFORNIA, A COPY OF WHICH IS ATTACHED TO THIS AGREEMENT AS EXHIBIT 1. I understand that nothing in this Agreement is intended to expand the scope of protection provided me by Sections 2870 through 2872 of the California Labor Code.

     (c)   License. If, under applicable law notwithstanding the foregoing, I retain any right, title or interest (including any Intellectual Property Right) with respect to any Company Invention, I hereby grant and agree to grant to the Company, without any limitations or additional remuneration, a worldwide, exclusive, royalty-free, irrevocable, perpetual, transferable and sublicenseable (through multiple tiers) license to make, have made, use, import, sell, offer to sell, practice any method or process in connection with, copy, distribute, prepare derivative works of, display, perform and otherwise exploit such Company Invention and I agree not to make any claim against the Company or its affiliates, suppliers or customers with respect to such Company Invention.

     (d)   Records; Disclosure. I agree to keep and maintain adequate and current written records regarding all Inventions made, conceived, discovered or developed by me (either alone or jointly with others) during my period of employment or after the termination of my employment if based on or using Proprietary Information or otherwise in connection with my activities as an employee of the Company. I agree to make available such records and disclose promptly and fully in writing to the Company all such Inventions, regardless of whether I believe the Invention is a Company Invention subject to this Agreement or qualifies fully under the provisions of Section 2870(a) of the California Labor Code, and the Company will examine such disclosure in confidence to make such determination. Any such records related to Company Inventions shall be the sole property of the Company.

     (e)   Assistance and Cooperation. I agree to cooperate with and assist the Company, and perform, during and after my employment, all acts deemed necessary or desirable by the Company, to apply for, obtain, establish, perfect, maintain, evidence, enforce or otherwise protect any of the full benefits, enjoyment, right, title and interest throughout the world in the Company Inventions. Such acts may include, but are not limited to, execution of assignments of title and other documents and assistance or cooperation in legal proceedings. Should the Company be unable to secure my signature on any such document, whether due to my mental or physical incapacity or any other cause, I hereby irrevocably designate and appoint the Company and each of its duly authorized representatives as my agent and attorney-in-fact, with full power of substitution and delegation, to undertake such acts in my name as if executed and delivered by me (which appointment is coupled with an interest), and I waive and quitclaim to the Company any and all claims of any nature whatsoever that I may have or may later have for infringement of any Intellectual Property Rights in or to the Company Inventions.

     (f)   Moral Rights. To the extent allowed by applicable law, the assignment of the Company Inventions includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively

"Moral Rights"). To the extent I retain any such Moral Rights under applicable law, I hereby waive and agree not to institute, support, maintain or permit any action or proceeding on the basis of, or otherwise assert, such Moral Rights. I hereby authorize the Company to publish the Company Inventions in the Company's sole discretion with or without attributing any of the foregoing to me or identifying me in connection therewith and regardless of the effect on such Company Inventions or my relationship thereto. I agree to ratify and consent to any action that may be taken or authorized by the Company with respect to such Company Inventions, and I will confirm any such ratifications and consents from time to time as requested by the Company.

(g)     Excluded Inventions. I agree to identify in Schedule A all Inventions, if any, that I wish to exclude from the scope of this Agreement, including all Inventions made, conceived, discovered or developed (either alone or jointly with others) prior to my employment by the Company (collectively, "Excluded Inventions"). I represent and warrant that such list is complete and accurate, and I understand that by not listing an Invention I am acknowledging that such Invention was not made, conceived, discovered or developed prior to my employment by the Company.

(h)     Employee Inventions and Third Party Inventions. I shall not, without prior written approval by the Company, make any disclosure to the Company of or incorporate into Company property or Company Inventions any Invention owned by me or in which I have an interest ("Employee Invention") or owned by a third party ("Third Party Invention"). If, in the course of my employment with the Company, I make any disclosure to the Company of or incorporate into Company property or Company Inventions an Employee Invention, with or without Company approval, I hereby grant and agree to grant to the Company a worldwide, nonexclusive, royalty-free, irrevocable, perpetual, transferable and sublicenseable (through multiple tiers) license to make, have made, use, import, sell, offer to sell, practice any method or process in connection with, copy, distribute, prepare derivative works of, display, perform and otherwise exploit such Employee Invention and I agree not to make any claim against the Company or its affiliates, suppliers or customers with respect to any such Employee Invention.

(i)     Representations; Warranties and Covenants. I represent, warrant and covenant that: (i) I have the right to grant the rights and assignments granted herein, without the need for any assignments, releases, consents, approvals, immunities or other rights not yet obtained; (ii) any Company Inventions that are copyrightable works are my original works of authorship; and (iii) neither the Company Inventions nor any element thereof are subject to any restrictions or to any mortgages, liens, pledges, security interests, encumbrances or encroachments.

(j)     Adequate Consideration. I acknowledge that the Company Inventions and the associated Intellectual Property Rights may have substantial economic value, that any and all proceeds resulting from use and exploitation thereof shall belong solely to the Company, and that the salary and other compensation I receive from the Company for my employment with the Company includes fair and adequate consideration for all assignments, licenses and waivers hereunder.

6.     **Prohibition on Disclosure or Use of Third Party Confidential Information.** I will not disclose to the Company or induce the Company to use any confidential, proprietary or trade secret information or materials belonging to others (including without limitation any former employers) at any time, nor will I use any such information or materials in the course of my employment with the Company. I acknowledge that no officer or other employee or representative of the Company has requested or instructed me to disclose or use any such information or materials, and I will immediately inform my supervisor in the event I believe that my work at the Company would make it difficult for me not to disclose to the Company any such information or materials.

7.     **No Conflicts; Former Agreements.** I represent and warrant that I have no other agreements or relationships with or commitments to any other person or entity that conflict with my obligations to the Company as an employee of the Company or under this Agreement, and that my employment and my performance of the terms of this Agreement will not require me to violate any obligation to or confidence with

another. I agree I will not enter into any oral or written agreement in conflict with this Agreement. Except as disclosed on Schedule A to this Agreement, I represent and warrant that I have not entered into any other agreements or relationships with or commitments to any other person or entity regarding proprietary information or Inventions.

**8.** **Third Party and Government Contracts.** I understand that the Company has or may enter into contracts with other persons or entities, including the United States government or its agents, under which certain Intellectual Property Rights will be required to be protected, assigned, licensed, or otherwise transferred. I hereby agree to be bound by all such agreements, and to execute such other documents and agreements as are necessary to enable the Company to meet its obligations under any such contracts.

**9.** **Termination; Return of Materials.** I agree to promptly return all property of the Company, including, without limitation, (a) all source code, books, manuals, records, models, drawings, reports, notes, contracts, lists, blueprints, and other documents or materials and all copies thereof, (b) all equipment furnished to or prepared by me in the course of or incident to my employment, and (c) all written or tangible materials containing Proprietary Information in my possession upon termination of my employment for any reason or at any other time at the Company's request. Following my termination, I will not retain any written or other tangible material containing any Proprietary Information or information pertaining to any Company Invention. I understand that my obligations contained in this Agreement will survive the termination of my employment and I will continue to make all disclosures required of me by Section 5(c) above. In the event of the termination of my employment, I agree, if requested by the Company, to sign and deliver the Termination Certificate attached as Schedule B hereto. I agree that after the termination of my employment, I will not enter into any agreement that conflicts with my obligations under this Agreement. The termination of any employment or other agreement between the Company and me shall not terminate this Agreement and each and all of the terms and conditions hereof shall survive and remain in full force and effect.

**10.** **Remedies.** I recognize that nothing in this Agreement is intended to limit any remedy of the Company under prevailing law governing the protection of trade secrets or other Intellectual Property Rights. In addition, I acknowledge that any breach by me of this Agreement would cause irreparable injury to the Company for which pecuniary compensation would not afford adequate relief and for which it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief to the Company. Therefore, I agree that if I breach any provision of this Agreement, the Company shall be entitled to injunctive or other equitable relief to remedy any breach or prevent any threatened breach of this Agreement, without the necessity of posting bond or other security or proving it has sustained any actual damage. This remedy will be in addition to any other remedies available to the Company at law or in equity.

**11.** **Miscellaneous Provisions.**

(a) Assignment; Binding Effect. I acknowledge and agree that my performance is personal hereunder, and that I shall have no right to assign, delegate or otherwise transfer and shall not assign, delegate or otherwise transfer any rights or obligations under this Agreement. Any such assignment, delegation or other transfer shall be null and void. This Agreement may be assigned or transferred by the Company. Subject to the foregoing, this Agreement shall inure to the benefit of the Company and its affiliates, successors and assigns, and shall be binding on me and my heirs, executors, administrators, devisees, spouses, agents, legal representatives and successors in interest.

(b) Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of California, without giving effect to its conflict of law rules.

(c) Jurisdiction. Except for actions for injunctive or other equitable relief, which may be brought in any court of competent jurisdiction, any legal suit, action or proceeding arising out of or relating to this Agreement shall be commenced in a federal court in the Southern District of California or in state court in

the County of San Diego, California, and each party hereto irrevocably submits to the exclusive jurisdiction and venue of any such court in any such suit, action or proceeding.

      (d)    Severability. If any provision of this Agreement, or application thereof to any person, place, or circumstance, shall be held by a court of competent jurisdiction to be unenforceable, such provision shall be enforced to the greatest extent permitted by law and the remainder of this Agreement shall remain in full force and effect.

      (e)    Waivers. Delay or failure to exercise any right or remedy under this Agreement shall not constitute a waiver of such right or remedy. Any waiver of any breach of this Agreement shall not operate as a waiver of any subsequent breaches. All rights or remedies specified for a party herein shall be cumulative and in addition to all other rights and remedies of the party hereunder or under applicable law.

      (f)    Interpretation. This Agreement shall be construed as a whole, according to its fair meaning, and not in favor of or against any party. Sections and section headings contained in this Agreement are for reference purposes only, and shall not affect in any manner the meaning of interpretation of this Agreement. Whenever the context requires, references to the singular shall include the plural and the plural the singular and any gender shall include any other gender.

      (g)    Entire Agreement; Amendment. This Agreement, including without limitation the Schedules and Exhibits hereto, constitutes the entire agreement between the Company and me with respect to the subject matter hereof and replaces and supersedes any prior or existing agreement entered into by me and the Company with respect to the subject matter hereof. This Agreement may not be modified or amended, in whole or in part, except by a writing signed by me and a duly authorized representative of the Company other than me. I agree that any subsequent change in my duties or compensation for employment will not affect the validity or scope of this Agreement.

I HAVE READ THIS AGREEMENT AND I UNDERSTAND AND ACCEPT MY OBLIGATIONS UNDER THIS AGREEMENT. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY.

Date: _____01 / 30 / 15_____      _BRIAN ANDERSON_
                                       Employee Name

                                       Employee Signature

**EXHIBIT 1**

**CALIFORNIA LABOR CODE
SECTION 2870-2872**

2870. (a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

> 1.   Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

> 2.   Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

2871. No employer shall require a provision made void and unenforceable by Section 2870 as a condition of employment or continued employment. Nothing in this article shall be construed to forbid or restrict the right of an employer to provide in contracts of employment for disclosure, provided that any such disclosures be received in confidence, of all of the employee's inventions made solely or jointly with others during the term of his or her employment, a review process by the employer to determine such issues as may arise, and for full title to certain patents and inventions to be in the United States, as required by contracts between the employer and the United States or any of its agencies.

2872. If an employment agreement entered into after January 1, 1980, contains a provision requiring the employee to assign or offer to assign any of his or her rights in any invention to his or her employer, the employer must also, at the time the agreement is made provide a written notification to the employee that the agreement does not apply to an invention which qualifies fully under the provisions of Section 2870. In any suit or action arising thereunder, the burden of proof shall be on the employee claiming the benefits of its provisions.

**SCHEDULE A**
**EMPLOYEE DISCLOSURE**

**1.  PROPRIETARY INFORMATION**

Except as set forth below, I acknowledge that at this time I know nothing about the business or Proprietary Information of Mitchell International, Inc., a Delaware corporation (the "Company"), other than information I have learned from the Company in the course of being hired:

_____

_____

(Check here _____ if continued on additional attached sheets)

**2.  EXCLUDED INVENTIONS**

The following information is provided in accordance with Section 5 of the Employee Proprietary Information and Invention Assignment Agreement ("Agreement") executed by me:

_____  I have made no Inventions prior to my employment with the Company that are owned by me (either alone or jointly with others) and I do not wish to exclude any Inventions from the scope of the Agreement.

X  The following is a complete and accurate list of all Inventions I have made, conceived, discovered or developed prior to my employment with the Company, that are owned by me (either alone or jointly with others), which I wish to exclude from the scope of the Agreement:

*See attached* _____

_____

(Check here  X  if continued on additional attached sheets)

**3.  FORMER AGREEMENTS**

The following information is provided in accordance with Section 5(j) of the Agreement:

X  I am not party to any agreement or have any relationship with or commitment to any other person or entity regarding proprietary information or Inventions.

_____  The following is a complete and accurate list of all agreements, relationships with or commitments to any other person or entity regarding proprietary information or Inventions.  I have attached copies of any such agreements in my possession or, to the extent that I am prohibited from doing so due to confidentiality obligations, I have summarized the relevant terms thereof.

_____

_____

(Check here  X  if continued on additional attached sheets)

Date: _01/30/15_____

Employee Name _____

Employee Signature _____

Brian Anderson
Proprietary Information and Invention Assignment
Excluded Inventions Attachment

(1)     Inventions relating to providing call center services in the transportation business, which business is currently operated by Cogent Call Center, LLC, a Utah limited liability company of which I am the beneficial owner, solely to the extent such Inventions were not otherwise used by Cogent Works, LC, a Utah limited liability company ("Cogent Works"), Auto Rx, LC, a Utah limited liability company ("Auto Rx"), Comp Today, LC, a Utah limited liability company ("Comp Today"), or Cogent Care, LLC, a Utah limited liability company ("Cogent Care"), in the operation of their respective businesses.

(2)     Inventions relating to providing mobile diagnostic services, which business is currently operated by NOA Diagnostics of the West, LLC, a Utah limited liability company of which I am the beneficial owner, solely to the extent such Inventions were not otherwise used by Cogent Works, Auto Rx, Comp Today or Cogent Care in the operation of their respective businesses.

(3)     Inventions relating to providing nonemergency transportation services in the transportation business, which business is currently operated by Cogent Non-Emergency Transportation, LC, a Utah limited liability company of which I am the beneficial owner, solely to the extent such Inventions were not otherwise used by Cogent Works, Auto Rx, Comp Today or Cogent Care in the operation of their respective businesses.

(4)     Inventions relating to revenue cycle and insurance benefit management of radiology claims covered by property and casualty insurance for persons injured in an auto accidents or accidents covered by workers' compensation policies, which business is currently operated by Image Ally, LLC, a Utah limited liability company of which I was the beneficial owner prior to January 30, 2015, when I divested all of my ownership interests in such entity, solely to the extent such Inventions were not otherwise used by Cogent Works, Auto Rx, Comp Today or Cogent Care in the operation of their respective businesses.

**SCHEDULE B**

**TERMINATION CERTIFICATE CONCERNING
PROPRIETARY INFORMATION AND COMPANY INVENTIONS**

This document is to certify that I have returned all property of Mitchell International, Inc., a Delaware corporation (the "Company"), including, without limitation, (a) all source code, books, manuals, records, models, drawings, reports, notes, contracts, lists, blueprints, and other documents or materials and all copies thereof, (b) all equipment furnished to or prepared by me in the course of or incident to my employment, and (c) all written and tangible materials containing Proprietary Information in my possession.

I further certify that I have reviewed the Employee Proprietary Information and Invention Assignment Agreement (the "Agreement") signed by me and that I have complied with and will continue to comply with all of its terms, including, without limitation, (i) the disclosure of any Inventions made, conceived, discovered or developed by me (either alone or jointly with others) during my period of employment or after the termination of my employment if based on or using Proprietary Information or otherwise in connection with my activities as an employee of the Company, and (ii) the preservation as confidential of all Proprietary Information pertaining to the Company.  This certificate in no way limits my responsibilities or the Company's rights under the Agreement.

On termination of my employment with the Company, I will be employed by _____ in the position of _____.


Date: _____        _____

                                             Employee Name


                                             _____

                                             Employee Signature

**Exhibit B**

**Release**

## RELEASE AGREEMENT

This Release Agreement (the "Agreement") is made and entered into by and between MITCHELL INTERNATIONAL, INC., a Delaware corporation (hereinafter referred to as the "Company") and BRIAN ANDERSON (hereinafter referred to as "Executive"). Executive and the Company are sometimes collectively referred to herein as the "Parties," and individually as a "Party."

### Recitals

WHEREAS, Executive's employment with the Company terminated effective _____ __, _____ (the "Termination Date");

WHEREAS, pursuant to that certain Executive Employment Agreement between the Parties dated as of January 30, 2015 ("Employment Agreement"), Executive is entitled to Severance Pay (as such term is defined in the Employment Agreement); and

WHEREAS, Executive is willing to enter into this Agreement, and be bound by the promises, covenants, agreements and conditions contained herein, including the waivers and releases set forth below, in exchange for the Severance Pay to be paid by the Company pursuant to the terms of the Employment Agreement.

NOW, THEREFORE, in consideration of the promises, covenants, agreements and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### Agreement

1.     **End of Employment Relationship.**  The Parties acknowledge and agree that Executive's at-will employment with the Company ended as of the Termination Date.

2.     **Payment of Wages or Salary through the Termination Date.**  Executive acknowledges that, before executing this Agreement, Executive has had the opportunity to confirm that he has received all wages, salary, bonuses, commissions and any other compensation owed to Executive through the Termination Date . Executive acknowledges that he is not entitled to any other wages, salary, bonuses, commissions or other compensation, except for the Severance Pay to be paid pursuant to the terms of the Employment Agreement.

3.     **Payment for Unpaid Accrued Vacation Leave, PTO and Other Benefits through the Termination Date.**  Executive acknowledges that, before executing this Agreement, Executive has had the opportunity to confirm that he has received payment for all accrued vacation leave, PTO leave and other benefits to which Executive is entitled through the Termination Date.

4.     **Release of Claims by Executive.**

(a)     Except as otherwise provided herein, in consideration for the Severance Pay to be paid to Executive pursuant to the terms of the Employment Agreement, Executive, on behalf of himself and Executive's heirs, executors, administrators, successors and assigns, knowingly and voluntarily waives, releases and forever discharges the Company, and all of its parent, subsidiary or affiliated companies, predecessors, successors and assigns, and all of their current and former officers, directors, shareholders, employees, insurers, attorneys, and agents, both individually and in their business capacities, as well as their

***YOU ARE ADVISED TO CONSULT WITH AN ATTORNEY***
***BEFORE SIGNING THIS DOCUMENT.***

SLC_1990578.1
sd-652734

employee benefit plans and programs and their administrators and fiduciaries (all of whom, together with the Company, are collectively referred to throughout the remainder of this Agreement as "Releasees"), of and from any and all claims, demands, actions, causes of action, losses, damages, fees, or costs of whatever nature or kind, known and unknown, asserted or unasserted, liquidated or contingent (collectively, the "Claims"), which Executive has, may have or claims to have against Releasees or one or more of them as of the Effective Date of this Agreement.

      (b)     The claims released herein include, without limitation, (1) any claims based either in whole or in part upon any facts, circumstances, acts, or omissions in any way arising out of, based upon, or related to Executive's employment with the Company or the termination thereof; (2) any claims arising under any federal or state statute or regulation, local ordinance, or the common law, regarding employment or prohibiting employment discrimination, harassment, or retaliation, including, without limitation, Title VII of the Civil Rights Act of 1964, the Equal Pay Act, the Age Discrimination in Employment Act, the Older Workers' Benefit Protection Act, the Labor Management Relations Act, the National Labor Relations Act, Section 1981 of the Civil Rights Act of 1866, the Americans with Disabilities Act, the Fair Labor Standards Act, the Executive Retirement Income Security Act, the Family and Medical Leave Act, the Worker Adjustment and Retraining Notification Act, the Health Insurance Portability and Accountability Act of 1996, the Vietnam Era Veterans Readjustment Act of 1974, the Uniformed Services Employment and Reemployment Rights Act, the Immigration Reform and Control Act of 1974, the Occupational Safety and Health Act, the Rehabilitation Act of 1973, the Worker Adjustment and Retraining Notification Act, the Sarbanes-Oxley Act of 2002, the Fair Credit Reporting Act, the Genetic Information and Discrimination Act, the Internal Revenue Code of 1986, the Utah Antidiscrimination Act, and the Utah Payment of Wages Act, all as amended, and/or any other federal, state, or local labor laws, wage and hour and wage payment laws, Executive relations, fair employment practices laws, and/or any whistleblower protection laws; (3) any claim for wrongful discharge, wrongful termination in violation of public policy, breach of contract, breach of the covenant of good faith and fair dealing, personal injury, harm, or other damages (whether intentional or unintentional), negligence, negligent employment, defamation, misrepresentation, fraud, intentional or negligent infliction of emotional distress, interference with contract or other economic opportunity, assault, battery, or invasion of privacy; (4) claims growing out of any legal restrictions on the Company's right to terminate its employees; (5) claims for wages, salary, commissions, bonuses, other compensation or fringe benefits; (6) any claim for general, special, or other compensatory damages, consequential damages, punitive damages, back or front pay, fringe benefits, attorney fees, costs, or other damages or expenses; (7) any claim for injunctive relief or other equitable relief; (8) any claim arising under any federal or state statute or local ordinance regulating the health and/or safety of the workplace; or (9) any other tort, contract or statutory claim.

      (c)     Notwithstanding anything set forth herein to the contrary, Executive does not release the Company or any of the Releasees from any Claim arising from, or any obligations that the Company or any Releasee may have under or with respect to, any of the following: (i) Executive's rights under the Company's 401(k) Plan, (ii) Executive's right to the continuation of insurance coverage under COBRA; (iii) Executive's right to apply for unemployment compensation or worker's compensation; (iv)) any claims or rights which cannot be waived pursuant to applicable law, (v) this Agreement, (vi) that certain Asset Purchase Agreement dated as of November 25, 2014 by and among the Company, Executive, Cogent Works, LC and certain other third parties (the "Purchase Agreement"), or (vii) any other Transaction Agreement (as defined in the Purchase Agreement).

      (d)     Nothing contained herein is intended to constitute or shall be construed as a waiver or release of Executive's right to file a charge or complaint with, or participate in an investigation by, the EEOC or any other federal or state agency. Executive is, however, waiving Executive's right to recover any monetary award, damages or any other form of recovery in connection with such a charge or complaint, whether such charge or complaint is filed by Executive or someone else, or such an investigation. Executive

*2*

further represents and warrants that Executive has not assigned or conveyed to any other person or entity any part of or interest in any of the claims released by Executive pursuant to this Agreement.

5.    **Non-Disparagement Obligation.**  Executive agrees not to defame, disparage or demean the Company, or any of the other Releasees, in any form or manner whatsoever.  Notwithstanding the foregoing, Executive shall not be prohibited from making truthful statements (a) to the EEOC or any other federal or state agency in connection with a charge or complaint of discrimination against the Company filed with the EEOC, (b) any other federal or state agency, or in connection with an investigation by the EEOC or any other federal or state agency involving the Company or (c) any legal or administrative proceeding or investigation.

6.    **Confidentiality of Agreement.**  Executive agrees not to disclose any information regarding the underlying negotiations leading up to, or the existence, terms or substance of, this Agreement, except as required or permitted by law; provided, however, that (a) Executive may disclose such information to Executive's spouse, attorney, accountant and/or tax advisor, provided such individual agrees to maintain the confidentiality of such information in accordance with the terms hereof or is under a professional duty to maintain the confidentiality of such information and (b) Executive may disclose the terms of this Agreement in any action or proceeding to enforce the terms of this Agreement.  Executive understands that this pledge of confidentiality is an integral part of the agreement of the Company to provide the Separation Pay and other consideration to Executive.  Executive acknowledges that a violation of this confidentiality covenant shall constitute a material breach of the Agreement.

7.    **Executive Covenants in Other Agreements Shall Remain in Effect.**  The Parties agree that the post-termination covenants and obligations set forth in the Employment Agreement, and all confidentiality, non-disclosure, non-compete, or non-solicitation covenants contained in other agreements previously entered into by Executive and the Company, shall remain in full force and effect following the Effective Date of this Agreement, and shall continue to be binding upon Executive, unless otherwise agreed in writing by the Parties.

8.    **No Admission of Liability or Wrongdoing.**  This Agreement shall not be construed as an admission by the Company that it has acted wrongfully with respect to Executive, or that Executive has any valid or enforceable claims or rights whatsoever against the Company, and the Company specifically denies any liability to, or wrongful act against, Executive, on the part of itself, its owners, officers, directors, Executives, agents, attorneys, affiliates and/or representatives.

9.    **Executive's Acknowledgment of Notices Pertaining to the Release of ADEA Claims.**  By his execution of this Agreement, Executive acknowledges and agrees:

(a)    that this Agreement includes a release of all claims under the Age Discrimination in Employment Act ("ADEA") arising up to and including the Effective Date of this Agreement, and that Executive has been advised of that fact and that Executive should fully consider this release before executing this Agreement;

(b)    that Executive has been given the opportunity to read this entire Agreement and has had all questions regarding its meaning and content answered to Executive's satisfaction;

(c)    that Executive has been advised of Executive's right to seek independent legal advice and counsel of Executive's own choosing regarding this Agreement, and that Executive has availed himself of that right to the extent Executive desired to do so before signing this Agreement;

(d)    that Executive has been advised that Executive has forty-five (45) days to consider this Agreement before signing it, and that Executive may revoke the Agreement within seven (7) calendar days after the date Executive signs it;

*3*

SLC_1990578.1
sd-652734

(e)     that Executive fully understands all of the provisions of this Agreement;

(f)     that the waiver and release of claims set forth herein is given in return for valuable consideration, as provided under the terms of this Agreement; and

(g)     that Executive is entering into this Agreement knowingly and voluntarily in exchange for the promises made in this Agreement and that no other representations or promises have been made to Executive to induce or influence Executive's execution of this Agreement.

10.     **Time to Sign Agreement.**  In accordance with the Older Worker's Benefits Protection Act, Executive may take up to forty-five (45) days from the date of receipt of this Agreement in which to review and consider it, consult with counsel of Executive's choosing about it, and sign the Agreement and deliver it to the Company.  Executive may sign the Agreement and deliver it to the Company before the end of the forty-five (45) day period.  If Executive has not signed and returned the Agreement to the Company by the end of the forty-five (45) day period, the offer shall be withdrawn automatically.

11.     **Time to Revoke Agreement.**  After signing this Agreement, Executive shall have seven (7) days within which to revoke this Agreement in its entirety.  If Executive revokes this Agreement, Executive will not be entitled to the Severance Pay referenced above and in the Employment Agreement, and this Agreement will be ineffective and void.  Executive may revoke Executive's acceptance of this Agreement by delivering, or causing to be delivered, to _____, the Company's _____, at _____, _____, _____, no later than the seventh (7th) day following the signing of this Agreement, a written notice revoking the acceptance of this Agreement.  After the seven-day period has elapsed, Executive shall not have the right to revoke or rescind this Agreement.

12.     **Effective Date.**  The effective date of this Agreement shall be the eighth day after it has been signed by Executive, provided the Agreement has not been revoked by Executive within the revocation period referenced in the preceding Section (the "Effective Date").

13.     **General Provisions.**

a.     **Attorneys' Fees and Costs.**  The Parties agree that, if an action is commenced to enforce the terms of this Agreement, or to recover for its breach, the prevailing Party shall be entitled to recover from the non-prevailing Party an amount equal to the prevailing party's attorneys' fees and costs incurred therein.

b.     **Entire Agreement and Modification.**  The Parties agree that this Agreement sets forth the entire agreement between the Company and Executive regarding the subject matter referenced herein.  This Agreement is an integrated agreement.  Executive acknowledges that Executive has not relied upon any representations or statements, written or oral, not set forth in this Agreement.  This Agreement cannot be modified except in writing and signed by both Parties.

c.     **Governing Law.**  This Agreement is entered into under, and shall be governed for all purposes by, the laws of the State of Utah.

d.     **Jurisdiction and Venue.**  Any action to enforce any right hereunder, to obtain a declaration of any right or obligation hereunder, or to recover for any breach hereof shall be brought in the Third Judicial District Court of Salt Lake County, State of Utah.  Executive hereby expressly consents to the jurisdiction and venue of the foregoing court for such purposes.

e.     **Waiver of Trial by Jury.  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION IN ANY**

*4*

**ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST THE OTHER PARTY OR ANY AFFILIATE OF SUCH OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE.  EXECUTIVE AND THE COMPANY AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION WILL BE TRIED BY THE COURT WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT ANY RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, CLAIM, COUNTERCLAIM OR PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION THEREOF.  THIS WAIVER WILL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.**

     f.  **Severability.**  If any provision of this Agreement is held to be invalid, void or unenforceable by a court of competent jurisdiction, the invalidity or unenforceability of that provision shall not affect the validity or enforceability of any other provision of this Agreement, and all other provisions shall remain in full force and effect.

     g.  **Headings.**  The paragraph headings have been inserted for purposes of convenience and shall not be used for interpretive purposes.

     h.  **Execution/Counterparts.**  This Agreement may be executed in counterparts, which counterparts, when so executed and delivered, shall be deemed to be an original, and all counterparts, taken together, shall constitute one and the same instrument.  This Agreement may be executed by facsimile or email copy and such facsimile or email copy of an original signature shall be given the same force and effect of an original signature.

[signature page follows]

IN WITNESS WHEREOF, the Parties have executed this Agreement on the dates set forth below.

THE COMPANY:

MITCHELL INTERNATIONAL, INC.

Date: _____          By_____
                                       Its _____

EXECUTIVE:

Date: _____          _____

                                       BRIAN ANDERSON

***YOU ARE ADVISED TO CONSULT WITH AN ATTORNEY***
***BEFORE SIGNING THIS DOCUMENT.***

# EXHIBIT B

# PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT FOR EMPLOYEE

I am now engaged as an employee of Mitchell International, Inc. (hereinafter "Mitchell"). I understand that:

- A.  As an employee of Mitchell, I am expected to perform certain services, and in connection with such duties I may have access to certain confidential information and trade secrets of Mitchell, and may in the course of this employment with Mitchell discover or conceive an invention.
- B.  There is a desire to define the rights and obligations between Mitchell and I with respect to the subject matter hereto.

I hereby agree as follows:

1.  All Proprietary Information shall be the sole property of Mitchell and its assigns, and Mitchell and its assigns shall be the sole owner of all patents and other rights in connection therewith.

2.  At all times, during my employment with Mitchell and after the termination of such employment, I will keep in confidence and will not use or disclose any Proprietary Information or Third Party Information or anything directly related to it, except as required in the ordinary course of performing my work for Mitchell, or with Mitchell's prior written approval. I will also use my best efforts to prevent unauthorized reproduction, disclosure or use of any Proprietary Information or Third Party Information that is not known by the trade generally, even though portions of such information may be publicly available or may be available to certain third parties pursuant to arrangements with Mitchell or otherwise.

3.  I have read the following and understand that "Nonpublic Personal Information and Protected Health Information" is defined with reference to the Gramm-Leach-Bliley Act of 1999, the Health Insurance Portability and Accountability Act of 1996 ("HIPPA") and any applicable federal and state laws and regulations ("Privacy Laws"). I understand that nonpublic personal information includes any information: (i) a consumer provided to one of our customers to obtain a financial product or service primarily for personal, family, or household purposes; (ii) about a consumer resulting from any transaction; (iii) otherwise obtained about a consumer in connection with providing the financial product or service to that consumer; and (iv) any list, description, or other grouping of consumers (and public available information pertaining to them) that is derived using any of the foregoing information that is not publicly available information. I understand that nonpublic personal information, in regard to Mitchell's medical products, also includes individually identifiable health information transmitted by electronic media or maintained in any other form or medium ("Protected Health Information").

I understand that as an employee of Mitchell International, Inc. ("Mitchell") I may, in connection with duties I perform as part of Mitchell's obligations under its agreements with insurance customers, obtain certain customer information which may be characterized as nonpublic personal information, as defined in the Privacy Laws, the use and disclosure of which is restricted by applicable Privacy Laws. I agree that I will maintain any Nonpublic Personal Information and Protected Health Information in accordance with such Privacy Laws .

4.  I acknowledge that the following items used in Mitchell's business are confidential, unique and valuable and were developed by Mitchell at great cost and over a long period of time. *I* further acknowledge that disclosure of any of said items to anyone other than Mitchell's officers, agents, or authorized employees, will cause Mitchell irreparable injury:
- a) Customer lists, call lists, marketing and sales information and other confidential data;
- b) Memoranda, notes, records and financial statements or projections;
- c) Sketches plans, drawings, manuscripts, software and software programs, confidential research and development data and information.

I will not disclose to anyone, other than Mitchell's officers, agents or authorized employees, unless otherwise directed in writing by Mitchell's department head, any use of the above-listed items or any of Mitchell's other confidential information or trade secrets, whether developed before or after the date of this Agreement.

Upon termination of my employment for any reason, I will, at once, return to Mitchell all of Mitchell's confidential material that is in my possession or control.

5.      I will promptly disclose to Mitchell, or any persons designated by it, all inventions, improvements, formulas, processes, techniques, know-how, and data (hereinafter "Inventions"), whether or not patentable, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of my employment that are related to or useful in the business of Mitchell, or result from the task assigned me by Mitchell or result from use of premises owned, leased, or contracted for by Mitchell.

6.      I agree that all Inventions shall be the sole property of Mitchell. By signing this Agreement, *I* assign to Mitchell all right, title and interest in and to such Inventions. I further agree as to all Inventions to do all acts necessary, both during and after the termination of my employment and without further consideration, to assist Mitchell in every proper way to obtain and enforce patents on said Inventions in any and all countries, and to that end, I will execute all documents for use in applying for, obtaining and enforcing such patents, as Mitchell may desire, together with any assignments thereof to Mitchell or persons designated by it. Mitchell shall pay all reasonable expenses related to such activities.

7. I represent that my performance of all the items of this Agreement and as an employee of Mitchell does not, to the best of present knowledge and belief, and will not breach any agreement or duty to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment with Mitchell. I have not entered into, and I agree I will not enter into any agreement, either written or oral, in conflict herewith.

8.      I acknowledge that I will not use, disclose or induce Mitchell to use any confidential information or documents belonging to others that I have in my possession. I represent that I will not violate any obligation to, or confidence with, another as a result of my employment with Mitchell. Similarly, I represent that I have obtained written authorization to possess any confidential information or documents of a former employer or client that I may have in my possession, which information or documents may or may not be used during my employment with Mitchell.

9.      Mitchell may enforce this Agreement by seeking either equitable relief or damages at law or both.

10.     This Agreement shall be interpreted in accordance with the State of California.

11.     I understand that this Agreement is not a contract of employment but is merely an expressed understanding between Mitchell and me concerning certain conditions applicable to my work at Mitchell. Nothing in this Agreement shall be construed to create employment for a fixed or periodic term. This Agreement shall be binding upon me, my heirs, executors, permitted assigns, and administrators and shall inure to the benefit of Mitchell, its affiliated companies, successors, and assigns. The provisions of this Agreement shall survive my termination for any reason whatsoever.

| COMPANY | EMPLOYEE |
| --- | --- |
| Human Resource Signature: | Employee Signature:<br>Natalie Neil |
| Date: | Date:<br>2/3/2015 7:06 PM |

# EXHIBIT C

# PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT FOR EMPLOYEE

I am now engaged as an employee of Mitchell International, Inc. (hereinafter "Mitchell"). I understand that:

A.     As an employee of Mitchell, I am expected to perform certain services, and in connection with such duties I may have access to certain confidential information and trade secrets of Mitchell, and may in the course of this employment with Mitchell discover or conceive an invention.

B.     There is a desire to define the rights and obligations between Mitchell and I with respect to the subject matter hereto.

I hereby agree as follows:

1.     All Proprietary Information shall be the sole property of Mitchell and its assigns, and Mitchell and its assigns shall be the sole owner of all patents and other rights in connection therewith.

2.     At all times, during my employment with Mitchell and after the termination of such employment, I will keep in confidence and will not use or disclose any Proprietary Information or Third Party Information or anything directly related to it, except as required in the ordinary course of performing my work for Mitchell, or with Mitchell's prior written approval. I will also use my best efforts to prevent unauthorized reproduction, disclosure or use of any Proprietary Information or Third Party Information that is not known by the trade generally, even though portions of such information may be publicly available or may be available to certain third parties pursuant to arrangements with Mitchell or otherwise.

3.     I have read the following and understand that "Nonpublic Personal Information and Protected Health Information" is defined with reference to the Gramm-Leach-Bliley Act of 1999, the Health Insurance Portability and Accountability Act of 1996 ("HIPPA") and any applicable federal and state laws and regulations ("Privacy Laws"). I understand that nonpublic personal information includes any information: (i) a consumer provided to one of our customers to obtain a financial product or service primarily for personal, family, or household purposes; (ii) about a consumer resulting from any transaction; (iii) otherwise obtained about a consumer in connection with providing the financial product or service to that consumer; and (iv) any list, description, or other grouping of consumers (and public available information pertaining to them) that is derived using any of the foregoing information that is not publicly available information. I understand that nonpublic personal information, in regard to Mitchell's medical products, also includes individually identifiable health information transmitted by electronic media or maintained in any other form or medium ("Protected Health Information").

I understand that as an employee of Mitchell International, Inc. ("Mitchell") I may, in connection with duties I perform as part of Mitchell's obligations under its agreements with insurance customers, obtain certain customer information which may be characterized as nonpublic personal information, as defined in the Privacy Laws, the use and disclosure of which is restricted by applicable Privacy Laws. I agree that I will maintain any Nonpublic Personal Information and Protected Health Information in accordance with such Privacy Laws .

4.     I acknowledge that the following items used in Mitchell's business are confidential, unique and valuable and were developed by Mitchell at great cost and over a long period of time. *I* further acknowledge that disclosure of any of said items to anyone other than Mitchell's officers, agents, or authorized employees, will cause Mitchell irreparable injury:

a) Customer lists, call lists, marketing and sales information and other confidential data;

b) Memoranda, notes, records and financial statements or projections;

c) Sketches plans, drawings, manuscripts, software and software programs, confidential research and development data and information.

I will not disclose to anyone, other than Mitchell's officers, agents or authorized employees, unless otherwise directed in writing by Mitchell's department head, any use of the above-listed items or any of Mitchell's other confidential information or trade secrets, whether developed before or after the date of this Agreement.

Upon termination of my employment for any reason, I will, at once, return to Mitchell all of Mitchell's confidential material that is in my possession or control.

5.      I will promptly disclose to Mitchell, or any persons designated by it, all inventions, improvements, formulas, processes, techniques, know-how, and data (hereinafter "Inventions"), whether or not patentable, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of my employment that are related to or useful in the business of Mitchell, or result from the task assigned me by Mitchell or result from use of premises owned, leased, or contracted for by Mitchell.

6.      I agree that all Inventions shall be the sole property of Mitchell. By signing this Agreement, *I* assign to Mitchell all right, title and interest in and to such Inventions. I further agree as to all Inventions to do all acts necessary, both during and after the termination of my employment and without further consideration, to assist Mitchell in every proper way to obtain and enforce patents on said Inventions in any and all countries, and to that end, I will execute all documents for use in applying for, obtaining and enforcing such patents, as Mitchell may desire, together with any assignments thereof to Mitchell or persons designated by it. Mitchell shall pay all reasonable expenses related to such activities.

7. I represent that my performance of all the items of this Agreement and as an employee of Mitchell does not, to the best of present knowledge and belief, and will not breach any agreement or duty to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment with Mitchell. I have not entered into, and I agree I will not enter into any agreement, either written or oral, in conflict herewith.

8.      I acknowledge that I will not use, disclose or induce Mitchell to use any confidential information or documents belonging to others that I have in my possession. I represent that I will not violate any obligation to, or confidence with, another as a result of my employment with Mitchell. Similarly, I represent that I have obtained written authorization to possess any confidential information or documents of a former employer or client that I may have in my possession, which information or documents may or may not be used during my employment with Mitchell.

9.      Mitchell may enforce this Agreement by seeking either equitable relief or damages at law or both.

10.     This Agreement shall be interpreted in accordance with the State of California.

11.     I understand that this Agreement is not a contract of employment but is merely an expressed understanding between Mitchell and me concerning certain conditions applicable to my work at Mitchell. Nothing in this Agreement shall be construed to create employment for a fixed or periodic term. This Agreement shall be binding upon me, my heirs, executors, permitted assigns, and administrators and shall inure to the benefit of Mitchell, its affiliated companies, successors, and assigns. The provisions of this Agreement shall survive my termination for any reason whatsoever.

| COMPANY | EMPLOYEE |
| --- | --- |
|  | joseph noll |
| Human Resource Signature: | Employee Signature: |
|  | Joseph Noll |
| Date: | Date: |
|  | 2/3/2015 2:04 PM |